OPINION. In determining the deficiencies herein, the Commissioner included in the taxable income of decedent certain deductions claimed as business expenses by Briden & Co. and Clinton Dye Works and also sales not entered upon the books of such companies and amounts credited to certain so-called capital accounts in 1940 and 1941 and treated as distributions of net profits to partners. Whether such items are in-cludible in their entirety in the taxable income of decedent depends upon whether or not Francis Coleman, Gladys Coleman, and Xavier Briden were partners with decedent in the business conducted under the name of Clinton Dye Works, and whether Gladys Coleman was a partner with decedent in the business conducted under the name of Briden & Co. The Commissioner determined that decedent was, during all the years in question, 1936 to 1942, inclusive, the sole owner of the two businesses. Petitioner does not contend that either company was a partnership for income tax'purposes. In his brief he states, in part, as follows: It must be borne in mind that Francis Coleman, Gladys Coleman, and Xavier Briden have maintained and still maintain that they are partners in the Clinton Dye Works. Their interests and claims are adverse to that of the Estate of Louis L. Briden and necessarily antagonistic. * * * His arguments are the same with respect to Briden & Co. He contends that the payments were deductible as compensation paid. It appears from the record that in February .1944 the petitioner, as administrator of the estate of decedent, commenced proceedings in the Superior Court of Suffolk County, Massachusetts, for the determination of whether Gladys Coleman, Francis Coleman, and Xavier Briden were the surviving partners of Clinton Dye Works and Gladys Coleman a surviving partner of Briden & Co.; that a decree was entered restricting all payments to the three named individuals to no more than $600 a month each; and that in January 1948, by proceedings instituted by Xavier Briden, a receiver was appointed to take charge of the business of both companies. We have no record of a determination of the question of the validity of the partnership as prayed for. Neither Francis Coleman, Gladys Coleman, nor Xavier Briden contributed any capital out of his own funds to either company. Decedent was sole owner of the two businesses and the relationship between him and such persons, in so far as the businesses are concerned, was that of employer and employees. Whatever the latter received, other than the amounts charged to their personal accounts, were gifts from decedent to them, the giving, or the amounts of which, were wholly in the discretion of decedent. There is no evidence that any of them exercised any authority as a partner or participated in the management of either business, or that decedent intended to create a real partnership relationship by establishing the capital accounts. Although a capital account was established for Robert Coleman on the books of Briden & Co., as of April 9, 1941, no part of the profits for 1941 was credited to that account, and upon his death in November 1942 his administrator received no part of the profits earned by Briden & Co. to the date of his death. All he received was a check for $1,000, the amount credited to the capital account when it was established. Francis Coleman, the administrator, made no claim for any profits earned after April 9,1941. Upon the record made, the determination of the Commissioner that decedent, during all the years involved, was the sole owner of Clinton Dye Works and Briden & Co. is approved. With respect to the amounts credited as of December 31, 1941 and 1942, to the capital accounts of Francis Coleman, Gladys Coleman, and Xavier Briden on the books of Clinton Dye Works and to the capital account of Gladys Coleman on the books of Briden & Co., it is alleged in the petition that the Commissioner erred in determining that “there was no arrangement with respect to distribution of profits” of the two companies, and that the “amounts are not proper inclusions in the taxable income of decedent.” Petitioner argues on brief that the amounts in question are deductible as compensation for personal services actually rendered under section 23 (a) (1) (A) of the Internal Revenue Code. It is contended by the respondent that there is no basis in the pleadings for petitioner’s contention and, furthermore, that there is no evidence in the record that the amounts credited to the capital accounts were intended as additional compensation or that reasonable compensation for personal services rendered by either Francis Coleman, Gladys Coleman, or Xavier Briden was in excess of the amounts paid to them as salary and allowed as deductions by him. In his reply brief the petitioner states that the partnership returns for the two businesses for the years in question “show a tremendous growth in business, no doubt due to war conditions,” and that “this fact, together with the further fact that these three individuals together with Louis L. Briden were the vital factors in running said businesses” during such years establish that the additional amounts were intended as compensation. There is no evidence showing that the three individuals were vital factors in running the two businesses. Nor is there any evidence showing that the efforts or duties of the three individuals increased with the growth of the businesses or that such growth was due to their efforts, thus entitling them to additional compensation. On the contrary, there is evidence indicating that there was no change in their duties in the year the capital accounts were set up or thereafter. Xavier Briden was not employed by decedent until May 1941. He was employed as a dyer. His salary was increased from $65 a week to $325, beginning July 1, 1942. Francis Coleman started as a dyer at $50 a week in 1933 or 1934. In 1937 he was receiving $325 a month, which was increased to $600 a month in June 1942. Gladys Coleman did some of the bookkeeping and other office work and exercised some supervision in the office. She received $6,000 in 1941 and $5,800 in 1942. The bookkeeper to whom was assigned the bookkeeping for both companies after November 1942 thereafter received only $35 a week. The testimony of Xavier Briden and Francis Coleman indicates that they regarded the credits as gifts and not compensation. Furthermore, the evidence shows that the monthly payments were charged to profit and loss in determining the book profit of the two companies. Thus such monthly payments were treated as an operating expense, i. e., compensation for services rendered. The additional amounts were not so treated. In our opinion, the evidence fails to show error in the determination of the respondent. The inclusion of the amounts credited to the three individuals on the books of Briden & Co. and/or Clinton Dye Works as of December 31,1941 and 1942, in the taxable income of decedent is approved. In determining the taxable income of decedent for 1940, 1941, and 1942, the Commissioner included therein the amounts of $1,441.95, $2,966.98, and $4,690.95, respectively, which had been charged on the books of Clinton Dye Works as traveling expenses of Francis Coleman and claimed as a deduction in computing the taxable income of the company. The petitioner, in his brief, “waived argument” on this issue. Although the respondent affirmatively alleged that the deductions for such traveling expenses were fraudulent with intent to evade taxes, the burden of proof to show error in the disallowance of the claimed deductions rests upon the petitioner. It is stated in L. Shepp Co., 25 B. T. A. 419, that the substantive issue (in that case a loss deduction) and the issue of fraud are: * * * clearly separate, for, although the determination of fraud necessarily implies falsity in the claim of loss, yet the respondent can and may determine the deduction to be based on a false or incorrect claim and still find no justification for imposing the fraud penalty. In either event his determination disallowing the loss deduction is by law presumed to be correct, while his determination of fraud carries no such presumption * * *. * < * * As to the issue raised by his determination of fraud, the burden is upon him; and he may fail to sustain such burden, notwithstanding the determined and presumed error in the return. In other words, both parties may fail through inadequate proof on their several issues, and thus the deficiency would be sustained and the penalty set aside. The above amounts are the aggregate amounts of checks charged on the books as traveling expense of Francis Coleman. The checks were not used by the latter to pay traveling expenses incurred by him on behalf of Clinton Dye Works and did not represent reimbursement to him for such expenses. While he endorsed all of the checks except one, Francis Coleman testified that he endorsed the checks at the request of decedent, returned the checks to him, and did not receive the proceeds thereof. Two of the checks were deposited in decedent’s personal bank account. In cross-examination of counsel for petitioner, the bookkeeper testified that Francis Coleman called on customers prior to the death of decedent and that thereafter he made more business calls. However, the expenses, if any, incurred on such business calls by Francis Coleman were not connected in any way with the above deductions. Since the disallowance of the deductions is presumptively correct and the petitioner has failed to show that the amounts disallowed were paid or incurred for traveling expenses, the action of the respondent must be approved. With respect to the proceeds of sales by Briden & Co. not entered on the books of account or reported for income tax purposes, the petitioner alleged that he believed that decedent did not receive the proceeds from such sales; that the proceeds were collected by others and should be excluded from the income of decedent. It is contended by petitioner on brief that the proceeds from the understated sales during 1936 to 1942, inclusive, were not received by decedent; that he was not cognizant that they were unrecorded; that they were misappropriated by Gladys and Robert Coleman; and that his estate is entitled to a deductible loss in the amount thereof under the provisions of section 23 (e) of the Internal Revenue Code. The petitioner concedes that the sales of Briden & Co. were understated and not recorded on the books of account or reported for income tax purposes. There is no evidence supporting his contention that Gladys and Robert Coleman appropriated the proceeds of such unrecorded sales. Gladys and Robert Coleman were employed by decedent. They kept the books of Briden & Co. until the death of Robert, in November 1942. Their authority to endorse and cash checks came from the decedent. It is not contended by petitioner that decedent did not know anything about the conduct of his business. It is conceded that the decedent was the administrative head of the business, that he must have had some comprehension of the use of the white cards and did use the same for price reference. The evidence shows that decedent, except when calling on customers or away on infrequent vacations, spent all of his time in the offices and the mill. In fact, after about July 1,1939. he lived on the premises. He employed salesmen and kept in close touch with them. He himself handled some customer accounts, exclusively. He opened the mail each day. He was familiar with the books of account and at times made entries in some of them. Of the unrecorded sales for 1936 to 1942, inclusive, a substantial portion thereof were sales to customers whose accounts decedent handled exclusively, as shown by the following schedule: [[Image here]] A check of Shetucket Worsted Mills, Inc., dated September 1,1937, in the amount of $1,512.03, payable to L. L. Briden & Co., shows on its face that it was in payment of six sales. Four of them, in the total net amount of $892.84, were recorded on the books, and two of them, in the total net amount of $619.19, were not recorded on the books. The check of Shetucket Worsted Mills, Inc., is endorsed “L. L. Briden & Co.” in the handwriting of decedent. That this check also bears the endorsement of Robert Coleman is not important. At that time, the endorsement of the person cashing the check was apparently required by the bank. This check was cashed on September 3, 1937, at the Clinton Trust Co., and on the samé day a treasurer’s check in the amount of $892.84 was purchased from the same bank. The decedent not only listed the treasurer’s check on a deposit slip of the First National Bank of Boston for deposit to the account of Briden & Co., but he also made the entry in the cash book giving credit to Shetucket Worsted Mills, Inc., for the payment of the four sales recorded on the books of account. Obviously, decedent was familiar with the entire transaction and the method employed in handling checks received in payment of both unrecorded and recorded sales. He endorsed six checks, one being in the amount of $3,889.52, received in 1936 in payment of unrecorded sales. Five of these checks were cashed. He also endorsed four of the 1937 checks. There is other evidence indicating that he had knowledge of the unrecorded sales. It is our conclusion that the unrecorded sales of Briden & Co. for the years 1936 to 1942, inclusive, are includible in the taxable income of decedent. The respondent made claim for increased deficiencies for 1938 to 1942, inclusive, based on the omission from gross income of Clinton Dye Works of the proceeds of the sale of waste by that company. He abandoned his claim for increased deficiencies for 1938 and 1939. The petitioner alleged that if any waste was sold by Clinton Dye Works it was sold without the knowledge of decedent by a person or persons claiming interest adverse to him and that such person or persons misappropriated the proceeds from such sales. On brief he contends that the proceeds from the sales of waste were misappropriated by Francis Coleman and that the petitioner is entitled to a deductible loss in the amount of such sales. He further contends that the respondent has failed to prove, as alleged by him, that the proceeds from the sale of waste were appropriated by the decedent to his own use and benefit, and that any amounts received by others initially were received with decedent’s knowledge and consent and were either paid to decedent or retained with decedent’s knowledge and consent. The petitioner concedes that for each of the years 1938 to 1942, inclusive, the respondent introduced evidence of the sale of waste by Clinton Dye Works to Heller & Michaelson Co. and for the years 1941 and 1942 to William Reisner & Co., and that such sales weré neither recorded in the books of Clinton Dye Works, nor reported in the income tax returns of decedent or partnership returns of Clinton Dye Works. That the decedent had knowledge or should have had knowledge of all such sales is shown by the evidence. The first and only sale in 1940 as disclosed by the evidence was a sale to Heller & Michaelson Co. in the net amount of $2,696.60. That the decedent participated in this sale is shown by an adding machine tape containing two separate additions of the poundage of bags or cartons of waste sold and also the description of such waste, i. e., “Colored” and “White,” which description is in the handwriting of decedent. An invoice was prepared from such tape. Furthermore, this sale was paid in part by a certified check in the amount of $1,000 payable to Clinton Dye Works which was endorsed “Clinton Dye Works L. L. Briden,” in the handwriting of decedent. Again, in 1941, a sheet from a calendar pad with weights and computations as to sale price on it, in the handwriting of decedent, served as an invoice for a sale to Heller & Michael-son Co., in the net amount of $638.40. There is also testimony by the bookkeeper who worked in the main office, the clerk who typed the invoices for waste and who worked in the mill office, and the shipping clerk who prepared the waste for shipment and weighed it, which indicates clearly that the decedent not only had knowledge that sales were made, but also that he saw and conferred with William Reisner, Heller, and Michaelson. The fact that Francis Coleman handled most of the sales is not important. He was superintendent of the mill and, as such, it was his duty to instruct the shipping clerk and the clerk in his office whenever sales were made with respect to preparing the waste for delivery and preparing invoices. His admission that after the death of decedent he sold waste and that “the cash was split three ways between Xavier Briden, Gladys Coleman and myself” is not proof that he appropriated all or any of the proceeds of sales of waste prior to the death of decedent, particularly since he testified that he delivered all the cash received by him to decedent, and petitioner has not shown that Francis Coleman actually received and retained, without the knowledge of decedent, any of the proceeds on the sale of waste received by him prior to the death of decedent. The testimony of Francis Coleman that decedent was usually present when sales of waste were made is corrobrated by the testimony of Michaelson, who testified that whenever he called at the office of Clinton Dye Works he asked for decedent, and that usually decedent and Francis Coleman were together when sales were made and paid for. This testimony is also corroborated by that of the bookkeeper, whose credibility has not been impugned. The petitioner relies upon the frequent visits of Francis Coleman to a safety deposit box at Clinton Trust Co. as absolute proof that Francis Coleman received the cash proceeds from the sale of waste and appropriated the same to his own use. This box was held jointly by Francis Coleman and decedent. Had he embezzled or appropriated the proceeds from sales of waste, it is reasonable to assume that he would not have placed them in a box to which decedent had access at any time. Francis Coleman testified that his visits to the box were, in part, due to the fact that decedent gave him sealed envelopes to put into the box, which within a day to a week he would return to decedent at the latter’s request. He admitted that he received and retained some of the proceeds, but only with the knowledge and consent of decedent and as gifts. The sales of waste were made by Clinton Dye Works. Since the decedent was the owner thereof, the proceeds from the sales of waste as set forth in our findings are includible in the taxable income of decedent for 1940,1941, and 1942, respectively. The petitioner alleged that respondent erred in including in income of decedent personal items of Gladys M. Coleman and Francis Coleman properly taxable to the recipients thereof, as follows: [[Image here]] The items are set forth in detail in the petition showing the payees and amount paid to each. It is contended in the petition that items enumerated “represent income taxable” to Francis Coleman or Gladys Coleman and are not proper inclusions in the taxable income of decedent. It, is not contended, and there is no evidence showing, that such amounts were paid as additional compensation. On the contrary, the evidence indicates that the amounts were intended as gifts. The amount of $386.67 was paid for the painting of the personal residence of Francis Coleman. The amounts paid out for Gladys Coleman were paid for expenses in connection with her personal residence, groceries, linens, jewelry, and other personal items. It is conceded that all the items represented personal expenditures. All the items were paid with checks of either Clinton Dye Works or Briden & Co. The funds upon which such checks were drawn represented income derived from the business as conducted by such companies, of which decedent was the owner. The amounts are therefore includible in his income. The next question to be considered is whether decedent filed fraudulent returns with intent to evade income taxes for 1936 to 1942, inclusive. It is conceded by respondent that, if this issue is determined in the negative, deficiencies for 1936 to 1938, inclusive, are barred by the statute of limitations. As argued by petitioner, the fact that the respondent determined a greater tax liability than reported and that his determination is sustained does not of itself establish fraud. James Nicholson, 32 B. T. A. 977; affd., 90 Fed. (2d) 978; Harold B. Franklin, 34 B. T. A. 927. It is also true, as argued by petitioner, that mere negligence is not proof of fraud, nor is ignorance or error of law. An intent or purpose to evade tax is essential. However, in Charles E. Mitchell, 32 B. T. A. 1093, it is stated as follows: Under the revenue laws every taxpayer is, in the first instance, his own assessor. He determines the amount of tax due. This privilege carries with it a concurrent responsibility to deal frankly and honestly with the Government — to make a full revelation and fair return of all income received and to claim no deductions not legally due. This responsibility is not properly discharged by resolving aU doubts against the Government, or by giving effect to studied efforts to wipe out taxable income by secret and questionable practices. It is a maxim of our law that, in dealing with the Government, taxpayers must turn square corners. ****** * * * * It [fraudulent intent] is to be gleaned from all the facts and the normal and reasonable inference therefrom. Though intent is a state of mind, its character is to be established, as other facts are established, by weighing all the evidence and applying the proper measure of proof. ******* The decedent was the owner of two businesses operating under the names of Clinton Dye Works and Briden & Co, Proceeds received from sales of waste by the former and sales of dyestuffs by the latter were not entered on the books of either company and were not reported in the individual return of decedent or partnership returns in the total amounts as follows: [[Image here]] In addition, numerous personal expenses, including expenditures for groceries, furniture, linens, clothing, telephone, electricity, doctor bills, cleaning, flowers, rent, and theater tickets, in substantial amounts, were charged on the books of both Clinton Dye Works and Briden & Co. to purchases or expense accounts and included in cost of goods sold or treated as business expenses. In 1940, 1941, and 1942, substantial amounts were charged on the books of Clinton Dye Works as travel expenses of Francis Coleman, which amounts were not received or expended by him for such purpose. In 1937,1940, and 1941 the amounts of $1,523.78, $933.54, and $625.75, respectively, were charged to purchases of Clinton Dye Works or bought from Xavier Briden, who never sold any dyestuffs, chemicals, or other products to that company. In 1937 capital expenditures for the installation of a new boiler in the aggregate amount of $3,654.56 were treated as business expenses. During 1942 capital expenditures for the construction of a building addition in the total amount of $30,340.10 were charged in large part to purchases and the remainder in part to the repairs, labor, and freight accounts. Partnership returns were filed for both Briden & Co. and Clinton Dye Works, although no real partnerships existed. The reduction of taxable income by the above means was not due to mere negligence, careless bookkeeping, or ignorance or error of law. The items were numerous and in the aggregate very substantial in amount. The reduction in income had become a practice and was carried on continuously for a period of seven years. No mistake in judgment or law has been shown. It is well known by all business men that proceeds of sales are includible in gross income and that personal expenses are not allowable deductions or a part of cost of goods sold. In M. Rea Gano, 19 B. T. A. 518, 533, it is stated as follows: * * * Though fraud is not proven merely by establishing that petitioner claimed unallowable deductions * * *, where a taxpayer has attempted to obtain unallowable deductions by falsely representing the character of the same, the good faith of the taxpayer is impugned and it is but reasonable to look to the recurring presence of such improper deductions as corroborative of the intent of the taxpayer to evade taxes. A failure to report for taxation income unquestionably received, such action being predicated on a patently lame and untenable excuse, would seem to permit of no difference of opinion. It evidences a fraudulent purpose. The record fails to show whether or not the decedent took part in the preparation of his returns or the partnership returns. Most of them were in the handwriting of Gladys Coleman. She signed the affidavit of preparation for decedent’s 1940 and 1941 returns. His signature appears on his personal returns. However, he can not escape his responsibility for a correct return by committing its preparation to others. Irving Fisher, 30 B. T. A. 433, and cases cited. Furthermore, the decedent, knowing that sales were not recorded and personal expenses charged to cost and as business expenses, must also have known that his returns, as well as the partnership returns, which reflected book income and expenses, were incorrect and false. For the same reason he must have known that the partnership returns were incorrect and false. Petitioner argues that the burden is not upon him to show the innocence of the decedent, but that the burden rests upon the respondent to prove fraud by clear and convincing evidence. In our opinion, the respondent has met his burden of proof, which proof the petitioner has failed to explain, refute, or rebut. He concedes that the returns were incorrect. His argument that decedent did not receive the income from the unrecorded sales and that such income was embezzled by Gladys Coleman, Robert Coleman, and Francis Coleman has been discussed heretofore. A careful consideration of all the evidence compels the conclusion that the falsity in the returns was known and deliberate and we have so found. The petitioner contends that the 50 per cent addition to the tax provided for by section 293 (b) if any part of any deficiency is due to fraud with intent to evade tax can not be assessed after the taxpayer’s death. The notices of deficiency were mailed on June 18, 1947, after the death of decedent on April 5,1943. The petitioner argues that a cause of action which is given by a Federal statute, if no specific provision is made by act of Congress for its survival, survives or not according to the principles of the common law (Sullivan v. Associated Billposters & Distributors, 6 Fed. (2d) 1000), that there is no specific provision providing that the penalty imposed by section 293 (b) of the Internal Revenue Code shall survive the death of the person against whom the penalty is assessed, and that under the rules of the common law actions for damages caused by fraud, being actions ex delicto, do not survive the death of the wrongdoer. Hensaw v. Miller, 17 How. 212, 219, 222. He argues that, regardless of whether the assessment is called an addition to the tax or other term indicative of compensation to the Government rather than a penalty, it is assessed because of the wrongful act (or tort) of the taxpayer, against the taxpayer himself for the purpose of punishing him for his wrongful act, and that such a cause of action must by its own nature be in substance ex delicto. A similar contention was made and considered in Helvering v. Mitchell, 303 U. S. 391. In that case the taxpayer had been indicted under section 146 (b) of the Revenue Act of 1928 for willfully attempting to defeat and evade income tax upon his net income for 1929. He was tried and acquitted. Thereupon a notice of deficiency was mailed to the taxpayer in which the Commissioner proposed to assess the 50 per cent addition to tax provided by section 293 (b) of the Revenue Act of 1928. The taxpayer appealed to the Board of Tax Appeals. He argued that the imposition of the penalties prescribed in section 293 (b) would constitute a second punishment for the same offense for which he was indicted and of which he was acquitted under the provisions of section 146 (b). In its opinion (32 B. T. A. 1093, 1136) the Board stated as follows: A careful study of the two sections convinces us that they are basically different in character and were enacted for wholly different purposes. The language of the two sections differs widely and contemplates situations which may require entirely dissimilar proof. ■Section 146 (b) is a statute defining a felony and establishing punishment and penalties for the commission of a crime. It is a punitive statute and prosecution thereunder is strictly a criminal proceeding initiated by the United States. Section 293 (b) imposes an additional 50 per cent of the deficiency if any part of the deficiency is due to fraud with intent to evade the tax. Proceedings thereunder are civil in character and are initiated by the taxpayer. The penalties contained therein are' likewise civil and were inserted in the taxing statutes to aid in collecting revenue. [Citations omitted.] They become a part, of the deficiency in tax and are collected in the same manner as the deficiencies. * * * Upon petition for review, the Circuit Court of Appeals for the Second Circuit affirmed the Board’s decision with respect to the deficiency in tax, but reversed the Board’s approval of the 50 per cent additional assessment under section 293 (b). Mitchell v. Commissioner, 89 Fed. (2d) 873. The Supreme Court reversed the Circuit Court of Appeals as to this point and in its opinion, affirming the Board, it stated, in part, as follows: In assessing income taxes the Government relies primarily upon the disclosure by the taxpayer of the relevant facts. This disclosure it requires him to make in his annual return. To ensure full and honest disclosure, to discourage fraudulent attempts to evade the tax, Congress imposes sanctions. Such sanctions may confessedly be either criminal or civil. * * * Congress may impose both a criminal and a civil sanction in respect to the same act or omission; for the double Jeopardy clause prohibits merely punishing twice, or attempting a second time to punish criminally, for the same offense. The question for decision is thus whether section 293 (b) imposes a criminal sanction. That question is one of statutory construction. * * * * * * * * * * The remedial character of sanctions imposing additions to a tax has been made clear by this Court in passing upon similar legislation. They are provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer’s fraud. * * * The fact that the Revenue Act of 1928 contains two separate and distinct provisions imposing sanctions, and that these appear in different parts of the statute, helps to make dear the character of that here invoked. The sanction of fine and imprisonment prescribed by section 146 (b) for willful attempts “in any manner to evade or defeat any [income] tax,” introduced into the act under the heading “Penalties,” is obviously a criminal one. The sanction of 50 per centum addition “if any part of any deficiency is due to fraud with intent to evade tax,” prescribed by section 293 (b), introduced into the act under the heading “Additions to the tax,” was clearly intended as a civil one. This sanction, and other additions to the tax are set forth in Supplement M, entitled “Interest and Additions to the Tax.” * * * Obviously all of these “Additions to the Tax” were intended by Congress as civil incidents of the asssessment and collection of the income tax. The Supreme Court concluded that Congress, in providing for the additional assessment under section 293 (b), intended a remedial or civil sanction and not a criminal or punitive sanction, and that in the civil enforcement of a remedial sanction there can be no double jeopardy. The above case is dispositive of petitioner’s contention that the 50 per cent addition is assessed to punish the taxpayer for his wrongful act. See also United States v. Glidden Co., 119 Fed. (2d) 235; certiorari denied, 314 U. S. 678; Harvey v. Early, 66 Fed. Supp. 761; affd., 160 Fed. (2d) 836; G. C. M. 22326, C. B. 1940-2, p. 159; Myrna S. Howell, 10 T. C. 859 (on appeal CCA-6, Aug. 16, 1948). As part of the deficiency for each of the taxable years 1936 to 1942, inclusive, is due to fraud with intent to evade tax, the imposition of the addition under section 293 (b) is mandatory. Decision will he entered wider Rule 50.