SIERRA CLUB, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8650–91.          Filed August 24, 1994.

---

*B. Holly Schadler* and *Karl L. Kellar,* for petitioner.
*Dianne I. Crosby,* for respondent.

### TABLE OF CONTENTS

|  | Page |
|---|---|
| Introduction | 310 |
| History of the Affinity Card Program | 311 |
| Chase Lincoln | 311 |
| Agreement with ABS | 311 |
| ABS-Concept Agreement | 315 |
| Concept-Chase Lincoln Agreement | 316 |
| Amendment to ABS-Concept Agreement and Concept-Chase Lincoln Agreement | 316 |
| SC-Chase Lincoln Agreement | 317 |
| ABS-Concept Modification | 317 |
| Discussion | 317 |
| I. Preliminary Matters | 317 |
| II. Motions for Partial Summary Judgment | 318 |
|   A. Petitioner's Motion | 318 |
|   B. Respondent's Motion | 318 |
|   C. Replies | 319 |
| III. Analysis | 319 |
|   A. Business Arrangements | 319 |
|     1. Marketing Efforts | 319 |
|     2. Credit Cards | 320 |
|     3. Compensation of Petitioner | 320 |
|   B. Questions Presented | 321 |
|   C. Joint Venture | 322 |
|     1. Introduction | 322 |
|     2. A Question of Intent | 322 |
|     3. Factors Considered | 323 |
|       a. Agreements | 324 |
|       b. A Proprietary Interest in Profits | 324 |
|         (1) *Luna v. Commissioner* | 324 |
|         (2) Revenues and Expenses | 325 |
|         (3) Petitioner's Share of Expenses | 325 |
|         (4) Petitioner's Obligation and Rewards | 326 |
|       c. Books of Account | 327 |

     d. Management and Control .................................................... 328
     e. Other Factors ...................................................................... 329
  4. Conclusion ................................................................................ 330
 D. Agency ......................................................................................... 330
  1. Respondent's Theory ................................................................ 330
  2. NCAA and FOP ....................................................................... 331
  3. Question Presented .................................................................. 332
  4. Recapitulation of the Agreement ............................................. 332
  5. Analysis ................................................................................... 333
     a. Financial Risks and Rewards ............................................... 333
       (1) Net Profits Interest .................................................... 333
       (2) Gross Profits Interest ................................................. 333
     b. Control .............................................................................. 334
       (1) Introduction .............................................................. 334
       (2) History ...................................................................... 334
       (3) The Agreement ......................................................... 335
       (4) Postagreement Events ............................................... 336
  6. Conclusion ............................................................................... 337
 E. License ......................................................................................... 337
  1. Introduction ............................................................................ 337
  2. Definition of Royalties ............................................................. 337
  3. Petitioner's Position ................................................................ 338
  4. Respondent's Position ............................................................. 338
  5. Analysis ................................................................................... 338
     a. Ambiguity .......................................................................... 338
     b. Question Presented ............................................................ 339
     c. The Agreement .................................................................. 340
     d. Pre- and Post-agreement Events ........................................ 341
  6. Conclusion ............................................................................... 344
IV. Conclusion ...................................................................................... 344

## OPINION

HALPERN, *Judge:* We have previously issued a report in this case: *Sierra Club, Inc. v. Commissioner,* T.C. Memo. 1993–199 (Sierra Club I). In that report, we dealt with the question of whether income from petitioner's rental of its mailing lists constituted unrelated business taxable income within the meaning of section 512(a)(1) (hereafter, UBTI).[1] We held that, since the mailing lists are intangible property, all consideration received for the use of those lists did not constitute UBTI because it constituted royalty income within the meaning of section 512(b)(2). We granted petitioner's motion for partial summary judgment with regard to that question. We concluded that material questions of fact did exist as to

---

[1] Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

whether any of the income derived by petitioner from its mailing list transactions was not royalty income because it constituted (1) sales income from the sale of the media on which the mailing lists were furnished or (2) income from the sale of substantial services provided in connection with the rental of the mailing lists. Accordingly, we denied petitioner's motion for partial summary judgment with regard to those questions. The parties have settled those questions, and we need not further concern ourselves with them. The parties, however, have filed additional motions for partial summary judgment, which we address in this report.

We will not repeat the preliminaries concerning respondent's determinations and other matters set forth in Sierra Club I. Suffice it to say that, in its petition, among other things, petitioner assigned error to respondent's determinations that royalties received by petitioner with respect to an "affinity credit card" program engaged in by petitioner during some of the years here in question constituted UBTI. Petitioner has moved for partial summary judgment that such income did not constitute UBTI because it constituted royalty income within the meaning of section 512(b)(2) (petitioner's motion), and has filed a memorandum of points and authorities in support thereof (petitioner's memorandum in support). Respondent has filed a notice of objection to petitioner's motion (respondent's objection) and a memorandum of law in support thereof (respondent's memorandum objecting). Petitioner has filed a reply (petitioner's reply). Respondent has moved for partial summary judgment in her favor with regard to the affinity card issue (respondent's motion), and has filed a memorandum of points and authorities in support thereof (respondent's memorandum in support). Petitioner has opposed respondent's motion (petitioner's objection) and respondent has replied thereto (respondent's reply). For the reasons stated, we will grant petitioner's motion and deny respondent's.

## Introduction

The parties have filed a joint stipulation of facts and attached stipulated documents as well as various affidavits and the memoranda previously described. We accept the stipulated facts as being true for purposes of deciding the

motions before us. The stipulation of facts and attached documents are incorporated herein by this reference. In opposing each other's motion, the parties have claimed that there are unresolved genuine issues of material fact to be tried or other disputes with regard to factual issues. Nevertheless, to make its case, both in support of its own motion and in opposition to its opponent's, each party relies on the stipulated underlying contractual agreements establishing the affinity card program. We will describe those agreements, set forth certain pertinent provisions, and state certain other undisputed facts as a first step in our analysis.

## History of the Affinity Card Program

The affinity card program in issue (the affinity card program or, simply, the program) is the product of numerous agreements among various parties. Among those parties are petitioner and a corporation named American Bankcard Services, Inc. (ABS). In 1980, petitioner was approached by a predecessor of ABS and entered into the negotiations that resulted in the agreements in question. In its initial proposal to petitioner, the predecessor of ABS described how affinity card programs work in essentially the following terms: Simply stated, the affinity group contracts with a financial institution to issue credit cards to its members and supporters. In return for encouraging its members and supporters to accept and use the credit cards, the financial institution pays the affinity group a percentage of the monthly sales volume resulting from transactions made with the cards. The financial institution provides the affinity group with certain other benefits and services.

## Chase Lincoln

The financial institution that participated in the program eventually entered into by petitioner was Chase Lincoln First Bank N.A. (Chase Lincoln).

## Agreement with ABS

On February 20, 1986, petitioner entered into an agreement with ABS, entitled: "SIERRA CLUB BANKCARD AGREE-

MENT" (the SC-ABS agreement). The following are among the provisions contained in the agreement:

SC and ABS desire to make available to the members of SC one or more packages of financial services upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, it is agreed by the parties hereto as follows:

ARTICLE 1. *The Services*

ABS proposes to offer members of SC the product and service options set forth in Attachment "A" hereto ( * * * the "Services").

ARTICLE 2. *SC Participation*

2.1 SC agrees to cooperate with ABS on a continuing basis in the solicitation and encouragement of SC members to utilize the Services provided by ABS, all as more specifically described herein.

* * * * * * *

2.3 ABS has entered into a written agreement whereby * * * [Chase Lincoln] has agreed to act as a financial institution to issue bankcards for SC. SC has selected Chase Lincoln as the financial institution to be the issuer of Sierra Club bankcards under this Agreement. * * *

* * * * * * *

ARTICLE 3. *Program Control*

* * * * * * *

3.2 ABS shall provide SC with monthly computer reports which set forth the Total Cardholder Sales Volume, as defined in Attachment "B" hereto, and the royalty fee payable to SC.

3.3 ABS shall be entitled to offer to SC members who select one of the options in Attachment "A" such other services or products as are mutually agreed upon from time to time between the parties hereto and for which mutually agreed upon compensation is paid to SC.

3.4 ABS shall keep and maintain true, correct and complete books of account and records from which SC royalty fees can be determined. * * * SC shall have the right at any time to examine, inspect, and audit all such books and records, and all such other papers and files of ABS relating to the performance of their Agreement.

3.5 ABS agrees that it will not use or permit to be used the SC name or marks without prior written consent in each and every instance.

ARTICLE 4. *Sharing of Income and Expense*

4.1 ABS agrees to remit or cause to be remitted to SC on a monthly basis throughout the term of this Agreement a royalty fee calculated in accordance with Attachment "B". * * *

4.2 ABS shall be responsible for the development of all promotional and solicitation materials and programs designed to encourage the acquisition and usage of the Services by the members of SC subject to the approval

by SC of all such materials and programs. The cost of such materials and programs shall be borne by ABS, and SC shall not be liable for any costs related thereto with the exception specified in Section 4.3 below. SC shall cooperate fully with ABS in encouraging the acquisition and use of the Services.

4.3 SC may elect to pay for the production and mailing costs associated with direct mail or other solicitations to its members to encourage their acquisition and use of the Services. In the event SC so elects, the royalties payable by ABS shall be adjusted as provided in paragraph 2 of Attachment "B."

4.4 ABS, its agents, or participating financial institutions shall be responsible for all expenses associated with the Services except for any non-Service related matters requested by SC such as special mailings, special printouts or other similar actions not part of bankcard routine operations. * * *

ARTICLE 5. *Term of Agreement*

* * * [4 years plus renewal periods] * * *

ARTICLE 6. *Hold Harmless*

6.1 ABS agrees to indemnify and hold SC and each and every participating SC member harmless from any and all direct or contingent liabilities, claims, damages, losses and expenses arising directly or indirectly from the activity of ABS, its agents, or participating financial institutions in participating in the program except for such expenses as are specified in Sections 4.3 and 4.4, and interest and other normal bankcard charges against cardholders for the Services.

6.2 SC agrees to indemnify and hold ABS, its agents, and participating financial institutions harmless from any and all direct or contingent liabilities, claims, damages, losses and expenses arising from SC activities in participating in the program to the extent that the same are the result of SC gross negligence or wilful misconduct.

6.3 Nothing in this Agreement shall be construed as constituting a partnership or agent/principal relationship between the parties.

ARTICLE 7. *Confidentiality*

7.1 ABS agrees that in the event of the termination of this Agreement, all data, documents and information pertaining to SC members will be returned forthwith to SC: provided however that ABS, its agents, or participating financial institutions may retain copies of any materials required to properly control and handle any established customer relationships. ABS agrees that it acquires no right under this Agreement to inspect, copy or gain possession of any list of members of SC or any part thereof.

7.2 ABS agrees that any and all information provided by SC shall be the sole property of SC, and shall not be used, transferred, reproduced or

otherwise dealt with by ABS, its agents or any participating financial institution except under terms and conditions approved by SC.

\* \* \* \* \* \* \*

ARTICLE 8. *Exclusivity*

\* \* \* \* \* \* \*

ARTICLE 9. *Event of Default*

In the event ABS fails to perform any of its obligations under this Agreement, SC shall give notice of such event ("Event of Default") to ABS. If ABS has not cured the Event of Default within 10 days after receipt of notice, SC may, in addition to its remedies at law or in equity, terminate this Agreement. If this Agreement terminates by expiration of the term set forth in Article 5 or pursuant to the provisions of Section 23, ABS and participating financial institutions may retain such records as are necessary in order for them to maintain any customer relationships established hereunder with any SC member. In the event this Agreement is terminated pursuant to this Article 9, notwithstanding any provision of this Agreement to the contrary, ABS shall, and ABS shall cause its agents and all participating financial institutions to, immediately (1) cease using the Sierra Club name and marks, (2) cease communicating with SC members except to the extent necessary to terminate the Services, and (3) return to SC all records relating to the performance of this Agreement, and all copies thereof, and make no effort to communicate with SC members thereafter.

ARTICLE 10. *Notices*

\* \* \* \* \* \* \*

ATTACHMENT "A"
DESCRIPTION OF AFFINITY GROUP BANKCARD PROGRAM

1. Qualified members of SC will be issued Sierra Club Visa and/or MasterCard credit cards which contain the standard bankcard design (either Visa or MasterCard) along with the name of SC on one side and the logo or other design of SC on the reverse side, as approved by Visa, USA, or MasterCard International.

\* \* \* \* \* \* \*

5. If the cardholder uses a special 800 number provided by ABS to make travel reservations and purchases using his Sierra Club bankcard, an additional royalty fee as set forth in Attachment "B" will be paid to SC.

6. Other enhancements such as Visa or MasterCard Travelers Checks and the ABS Universal Debit Bankcard will be made available to cardholders from time to time pursuant to mutually agreed upon royalty fees payable to SC.

ATTACHMENT "B"
ROYALTY FEE SCHEDULE

1. The royalty fee payable to SC shall be one half of one percent (0.5%) of the Total Cardholder Sales Volume if the fees received by ABS from the

participating financial institution are between 0.5% and 1.0% of the Total Cardholder Sales Volume. Total Cardholder Sales Volume is defined as the sum of all SC bankcard sales drafts resulting from purchases at merchants by members of SC using SC bankcards net of credit vouchers issued for returned merchandise or other services, and net of cash advances.

2. If SC elects to pursue the option specified in Section 4.3 of this Agreement and if the fees received by ABS from the participating financial institution are between 0.6% and 1.0% of the Total Cardholder Sales Volume, the royalty fee specified in Section 1. of this Attachment "B" shall be increased to six tenths of one percent (0.6%) of the Total Cardholder Sales Volume.

3. If the fees received by ABS from the participating financial institution are more than 1.0% of the Total Cardholder Sales Volume, the fee payable to SC, whether otherwise 0.5% or 0.6%, shall be increased by an amount equivalent to 50.0% of the fees payable to ABS in excess of 1.0%.

4. If the fees received by ABS from the participating financial institution are less than 1.0% of the Total Cardholder Sales Volume, but more than 0.5% (or, in the event SC elects the option referred to in Paragraph 2. above, more than 0.6%), there will be no decrease in the fees payable to SC under Paragraph 1. or 2. above. However, if the fees received by ABS are less than 0.6% or 0.5% (whichever is otherwise payable to SC), the fees payable to SC will be the total fees received by ABS from the participating financial institution.

5. When SC members use the 800 number travel service described in Section 5. of Attachment "A", SC will be paid a royalty of three percent (3.0%) of the price of airline tickets purchased with the Sierra Club bankcards and fifty percent (50.0%) of the hotel and car rental commissions received by the participating travel agency. These royalties are in addition to the royalties specified in Section 1., 2., 3., or 4. of this Attachment "B".

## ABS-Concept Agreement

On March 9, 1986, ABS entered into an agreement with a corporation named Concept I, Inc. (Concept), whereby ABS assigned to Concept its rights to solicit Sierra Club's members (members) for the program (ABS-Concept agreement). Among other things, that agreement provides that (1) by doing so, ABS intends to satisfy its obligations with respect to solicitation under the SC-ABS agreement (see par. 4.2 of SC-ABS agreement, *supra*) and (2) Concept and Chase Lincoln have entered into an agreement pursuant to which Chase Lincoln has agreed to act as the financial institution that will issue credit cards for the program (the Concept-Chase Lincoln agreement). Concept's obligations under the ABS-Concept agreement are tied to its rights and obligations under the Concept-Chase Lincoln agreement.

## Concept-Chase Lincoln Agreement

On March 28, 1986, Concept and Chase Lincoln entered into the Concept-Chase Lincoln agreement. That agreement recites that Chase Lincoln is willing to serve as the issuing financial institution with respect to the program. Among other provisions: Concept agrees to solicit (or cause to be solicited) the members for participation in the program. Concept must do so twice during the first 12-month period of the agreement and once during the second 12-month period. Concept must submit to Chase-Lincoln for approval all promotional material containing the name of the bank. Chase-Lincoln (sometimes the bank) agrees to issue to qualified members its Premier Visa Card. Such cards, as well as any indebtedness or other customer relationships resulting from use of the cards, become and remain the property of the bank. Information supplied by members to the bank in connection with the program becomes the property of the bank upon the issuance of a card to the member, for use in its sole discretion in the normal course of conducting its business. The bank agrees, however, that it will not disclose the fact that any participant in the program is a member. The bank agrees to pay to Concept a fee based on purchases made by members with a card. That fee will also vary depending on Chase Lincoln's cost of funds, which is determined with reference to the published discount rate applicable to 91-day Treasury bills. In no event, however, can the fee-paid concept decrease below 0.25 percent of the total purchases made by members with a card. Petitioner's interest in the agreement is acknowledged.

## Amendment to ABS-Concept Agreement and Concept-Chase Lincoln Agreement

On March 28, 1986, the ABS-Concept agreement and the Concept-Chase Lincoln agreement were amended (the ABS-Concept Concept-Chase Lincoln amendment) such that (1) should ABS fail to perform under the SC-ABS agreement, (2) should Concept fail to perform under the ABS-Concept agreement, or (3) should both ABS and Concept fail to perform under such agreements, Chase Lincoln had the right to assume the responsibilities and enforce the rights under such agreements.

## SC-Chase Lincoln Agreement

On March 26, 1986, petitioner and Chase Lincoln entered into an untitled agreement (the SC-Chase Lincoln agreement). That agreement (sometimes the agreement) references the SC-ABS agreement. Among other things, the agreement provides that (1) should ABS fail to perform under the SC-ABS agreement, Chase Lincoln has the right to assume the responsibilities and enforce the rights of ABS under that agreement and (2) during the term of the agreement (until March 28, 1988, unless extended) petitioner will not authorize any other bank to issue Visa credit cards to members.

## ABS-Concept Modification

By letter dated July 7, 1986, the ABS-Concept agreement was amended and modified (the ABS-Concept modification). Among other things, the letter provides that (1) Concept's duties to solicit members are reassigned back to ABS and (2) to compensate Concept for obtaining a bank issuer for the program, Concept may retain a portion of the payments it receives from Chase Lincoln.

## Discussion

### I. Preliminary Matters

In *Sierra Club, Inc. v. Commissioner,* T.C. Memo. 1993–199 (Sierra Club I), we discussed the appropriateness of a motion for summary judgment. We will not repeat that discussion here. We also spoke generally about the tax imposed by section 511(a)(1) on unrelated business taxable income (UBTI). We will not repeat that discussion here. Furthermore, in Sierra Club I, we discussed in detail the exclusion from the computation of UBTI for royalty income found in section 512(b)(2). We reconsidered and affirmed our analysis in *Disabled American Veterans v. Commissioner,* 94 T.C. 60, 70 (1990) (DAV II), revd. on other grounds 942 F.2d 309 (6th Cir. 1991), that, in section 512(b)(2), Congress used the term "royalties" in the conventional sense: "payments for the use of valuable intangible property rights".

## II. *Motions for Partial Summary Judgment*

### A. *Petitioner's Motion*

Petitioner's motion is clear: "Petitioner * * * moves * * * for a partial summary judgement holding that Sierra Club's income from an affinity credit card program for the years in dispute was royalties within the meaning of Section 512(b)(2) of the Internal Revenue Code, and therefore is exempt from unrelated business income tax." Petitioner's principal grounds are (1) there is no genuine issue as to any material fact and (2) petitioner is entitled to summary judgment as a matter of law pursuant to DAV II and Sierra Club I. Respondent recites two grounds in support of her objection to petitioner's motion: (1) That respondent's own motion should be granted, (2) alternatively, that there are unresolved genuine issues of material fact requiring trial.

### B. *Respondent's Motion*

Respondent's motion is simply "for summary judgement with regard to the affinity credit card issue in this case." In support thereof, respondent states that (1) there is no genuine issue as to any material fact regarding the affinity card program and (2) she is entitled to judgment as a matter of law. In her memorandum in support, respondent clarifies the basis for her motion:

> During the years in issue, SC was in the trade or business of promoting acquisition and use of its VISA credit card. SC did so either: 1) as a joint venturer with the Bank [Chase Lincoln] (or with Bank and ABS), in which case payments were a share of profits from selling credit card goods and services; or, alternatively, 2) as a "sole proprietor," in which case payments were for services.

Memorandum in support 3.[2] In petitioner's objection, among other things, petitioner sets forth certain "disputed facts".

---

[2] Respondent states the basis for her motion slightly differently in her memorandum of law in support of her notice of objection to petitioner's motion (memorandum objecting):

The net effect of the contracts in this case was to create either: 1) a joint venture between SC and Chase [Lincoln] (or among SC Chase [Lincoln] and ABS), in which case payments to SC were actually a share of "profits" from selling credit card goods and services; or, 2) SC was acting alone, in which case payments to SC were for SC's services in marketing and endorsing SC's credit card. [Memorandum objecting 5.]

## C. *Replies*

The parties have filed replies (respondent's reply and petitioner's reply). The replies convince us that the parties have laid down a path for us to follow to decide their motions that avoids any unresolved issues of material fact that would require a trial. Simply put, each side, both in support of its own motion and in opposition to its opponent's motion, is willing to rely on the terms of the agreements described above.[3] On that premise, we believe that the pleadings, motion papers, and, in particular, stipulation of facts and attached exhibits establish that there is no genuine issue as to any material fact and that a decision may be rendered as to whether the income received by petitioner from the affinity card program for the years in issue constituted royalties within the meaning of section 512(b)(2), and, therefore, was exempt from the tax on UBTI. See Rule 121(b). We believe that the income received from the affinity card program during the years in issue *did* constitute royalties within the meaning of section 512(b)(2), and, therefore, was exempt from the tax on UBTI. See sec. 512(a)(1). Our reasons are as follows.

## III. *Analysis*

### A. *Business Arrangements*

#### 1. *Marketing Efforts*

It is clear that the agreements described above (the agreements) establish an arrangement to be carried out for the mutual (but perhaps separate) profit of the parties thereto. Indeed, the parties have stipulated that, after the agreements were entered into (1) written marketing plans were prepared, setting forth a strategy to market Sierra Club Visa cards to members, (2) solicitations for such cards were sent

---

[3] See petitioner's reply (p. 1): "Petitioner agrees that the contracts are controlling"; respondent's reply (p. 2): "Because all documents are in the record, no trial is required; the Court can draw legal conclusions from the documents before the Court." Since we will grant petitioner's motion and deny respondent's, respondent's position in opposition to petitioner's is most important. In respondent's memorandum objecting, respondent states (p. 4): "There is no ambiguity in the contracts, thus the affidavits attached to SC's Motion are superfluous and should be ignored." Also, among other affidavits appended to respondent's notice of objection to petitioner's motion is the affidavit of respondent's trial counsel, Dianne I. Crosby. In that affidavit, Ms. Crosby states: "Respondent maintains that this case should be decided based on an examination of the contracts, all of the material terms of which are unambiguous." Crosby affidavit par. 9.

to members, and (3) advertisements for such cards appeared in Sierra magazine. Apparently, those marketing efforts met with some success. The parties have stipulated that, for petitioner's 1986 and 1987 tax years, it had gross receipts from its participation in the affinity card program of $6,021 and $303,225, respectively.

### 2. *Credit Cards*

Many people hold and use credit cards, and the use of credit cards has become a familiar aspect of contemporary American life. Stipulated documents establish the general nature of the arrangements underlying the use of credit cards.[4] Most cardholders no doubt understand that, in consideration of their agreeing to pay the credit card bill when it comes due, a financial institution is extending to them credit, which they may use to purchase goods and services. Generally, no interest charge is stated to the cardholder if the credit card bill is paid promptly. If the credit card bill is not paid promptly, however, the cardholder accesses the "credit reserve" feature of her card, and a stated charge for further credit is incurred. Participating vendors allow the financial institution a discount on the amount billed in exchange for prompt payment by the financial institution.

### 3. *Compensation of Petitioner*

Respondent states that banks that issue credit cards normally receive a discount of about 3 percent from participating vendors.[5] Respondent also states that Chase Lincoln "agreed to share with SC the revenues it received from merchants when individual holders of SC credit cards made purchases."[6] Respondent makes clear, however, that she is not claiming that petitioner shared in the stated interest charged cardholders by Chase Lincoln after a cardholder accessed her credit reserve: "The Bank [Chase Lincoln] may receive additional income from credit card services, e.g., interest on amounts outstanding over 30 days. These amounts were not

---

[4] Exhibit 11–K contains a document described as a "recapitulation of the VISA program"; Exhibit 12–L is entitled "Proposal for Sierra Club Credit Card Program". See, in particular, p. 10 of the recapitulation in Exhibit 11–K and pp. 5 and 6 of Exhibit 12–L, which describe the general workings of a credit card program.

[5] Respondent's memorandum in support 12 n.6.

[6] Respondent's memorandum in support 12.

shared with SC."[7] Petitioner has not objected to respondent's assertions.

## B. *Questions Presented*

That parties to a profitable arrangement may mutually, but separately, profit is not unusual. An author and her publisher may mutually profit from sales of the author's book. The author may earn a royalty based on the number of books sold; the publisher will profit if receipts from sales exceed costs. Petitioner's position, simply put, is that, with regard to the affinity card program, petitioner was in a position like that of the author, merely receiving a royalty for use of an intangible asset: "Sierra Club received royalty payments in exchange for the license of the use of intangible assets— Sierra Club's name and logo, and, perhaps, use of its mailing list."[8]

Respondent's position is less precise: "During the years in issue, SC was in the trade or business of promoting acquisition and use of its VISA credit card."[9] Respondent explains her position as follows: In the alternative, petitioner (1) as a joint venturer with Chase Lincoln (or with Chase Lincoln and ABS), was in the business of "selling credit card goods and services" or (2) as a sole proprietor, was in the business of providing its "services in marketing and endorsing SC's credit card".[10] The revenues produced by such a business, respondent would add, simply do not constitute royalties. Respondent's position seems to come down to the following: If petitioner was a joint venturer or sole proprietor in the business described, the income received from the affinity card activities could not have been royalties.

We will address, first, whether petitioner participated in a joint venture with regard to the affinity card program. Since we conclude that it did not, we will then examine the scope

---

[7] *Id.* n.6.

[8] Petitioner's memorandum in support 7.

[9] Respondent's memorandum in support 3.

[10] See respondent's memorandum in support 3; respondent's memorandum objecting 5.

Respondent's position is stated in somewhat different terms in her papers in support of her own motion and in her papers in opposition to petitioner's motion. Nevertheless, it is clear that respondent's position is the same in each case. In respondent's memorandum objecting, after setting forth her position as to the net effect of the agreements set forth above (either as a joint venturor or sole proprietor, petitioner is providing services), respondent states: "See Respondent's * * * [memorandum in support], *all relevant parts of which are incorporated herein by this reference.*" Respondent's memorandum objecting 5 (emphasis added).

of petitioner's activities to determine whether petitioner engaged in the business described or, alternatively, simply engaged in a licensing transaction.

### C. *Joint Venture*

#### 1. *Introduction*

In *Beck Chem. Equip. Corp. v. Commissioner,* 27 T.C. 840, 848–849 (1957), we gave extensive consideration to the issue of whether the taxpayer had associated with another party in a joint venture during the year in controversy. We said:

> The legal relationship known as a joint venture has been defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation," and also as "an association of persons to carry out a single business enterprise for profit." * * *

Those definitions are still pertinent. *Browning v. Peyton,* 918 F.2d 1516, 1520 (11th Cir. 1990); *Podell v. Commissioner,* 55 T.C. 429, 431 (1970); *Perlmutter v. Commissioner,* 44 T.C. 382, 406 (1965), affd. 373 F.2d 45 (10th Cir. 1967).

Under section 7701(a)(2), a joint venture is one of the various unincorporated associations included within the broad definition of a partnership "through or by means of which any business, financial operation, or venture is carried on". As we said in *Beck Chem. Equip. Corp. v. Commissioner, supra* at 849: "The Code thus makes its own classification and prescribes its own standards for qualification as a 'partnership,' and to the extent thereof, it supersedes local law for Federal income tax purposes. * * * [currently, pars. (b) and (c), sec. 301.7701–1, Proced. & Admin. Regs.]; *Commissioner v. Tower,* 327 U.S. 280 (1946)." Therefore, our use of the term "partnership" is a reference to that term as it is defined for Federal income tax purposes.

#### 2. *A Question of Intent*

The landmark cases setting forth what constitutes a valid partnership for Federal income tax purposes are *Commissioner v. Tower,* 327 U.S. 280 (1946), and *Commissioner v. Culbertson,* 337 U.S. 733 (1949). In *Tower,* the Supreme Court, in upholding this Court's conclusion that a partnership had not been established, stated:

When the existence of an alleged partnership arrangement is challenged by outsiders, the question arises whether the partners really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both. And their intention is a question of fact, to be determined from testimony disclosed by their "agreement, considered as a whole, and by their conduct in execution of its provisions". * * * [327 U.S. at 286–287; citations omitted.]

In *Culbertson,* the Supreme Court elaborated on the factors to be considered in determining the intent of the partners to form a partnership:

whether, considering all the facts—the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used, and any other facts throwing light on their true intent—the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise. * * * [337 U.S. at 742.]

Those principles and commentary are equally applicable where the kind of partnership is an alleged joint venture within the purview of section 7701(a)(2). *Luna v. Commissioner,* 42 T.C. 1067 (1964); *Beck Chem. Equip. Corp. v. Commissioner, supra*; see *Estate of Smith v. Commissioner,* 313 F.2d 724, 729 (8th Cir. 1963), affg. in part, revg. in part and remanding 33 T.C. 465 (1959). Thus, the inquiry we must make is whether petitioner and Chase Lincoln (or petitioner, Chase Lincoln, and ABS) "really and truly intended to join together for the purpose of carrying on business and sharing in the profits or losses or both." See *Commissioner v. Tower, supra* at 287.

### 3. *Factors Considered*

Our inquiry is factual, and courts have considered numerous factors as indicative of joint venture status. Among those factors are the agreement of the parties, a coproprietorship interest in the profits of the venture, a sharing of losses, the maintenance of separate books of account for the venture, and a joint participation in management. E.g., *Luna v. Commissioner,* 42 T.C. 1067, 1077–1078 (1964). A useful discussion of the various factors considered can be found at 1 McKee et al., Federal Taxation of Partnerships and Partners, par. 3.02 Indicia of a Partnership, at 3–8 (2d ed. 1990).

The evidence before us consists of the various agreements described above and other stipulated facts and exhibits.

a. *Agreements*

With regard to the agreements described above, no agreement here purports to be a partnership agreement. Indeed, the SC-ABS agreement specifically states that it is *not* to be construed as constituting a partnership relationship between petitioner and ABS. The ABS-Concept agreement and the Concept-Chase Lincoln agreement contain similar language. The SC-Chase Lincoln agreement is the only direct agreement between petitioner and Chase Lincoln. It is brief, and it would be difficult to interpret as expressing the intent that petitioner and Chase Lincoln intend to form a partnership. We do not find the absence of any explicit acknowledgment of joint venture status to be determinative.

b. *A Proprietary Interest in Profits*

(1) *Luna v. Commissioner*

In *Luna v. Commissioner, supra* at 1077–1078, we listed certain factors indicative of the intent to form a partnership. Among those factors, slightly modified, is the following:

whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or [to the contrary] whether one party was the agent or employee [or a licensor] of the other, receiving for his services [or property] contingent compensation in the form of a percentage of income; * * * [*Id.* at 1078.]

Unless petitioner possessed a "mutual proprietary interest in the net profits" of the affinity card program, and perhaps shared in losses, it is difficult to see how, on the record before us, we could conclude that petitioner and any of the parties to the agreements intended to form a partnership with regard to the program. Indeed, we have stated that the "central feature" of a joint venture is "a proprietary interest in the net profits of the enterprise coupled with an obligation to share its losses". *Federal Bulk Carriers, Inc. v. Commissioner,* 66 T.C. 283, 293 (1976), affd. 558 F.2d 128 (2d Cir. 1977).[11]

---

[11] In their text on partnership taxation, McKee et al., state with regard to the indicia of a

## (2) *Revenues and Expenses*

As respondent would have it, petitioner had a mutual proprietary interest with Chase Lincoln in the net profits originating from Chase Lincoln's extension of credit to cardholders up until the time that a cardholder accessed the credit reserve feature of her card. See *supra* sec. III. A. 3.

The *gross* profit to be earned from such extension of credit was in the nature of interest: Chase Lincoln extended credit to cardholders in consideration of Chase Lincoln's being able to collect from cardholders more (3 percent, according to respondent) than Chase Lincoln paid vendors. To extend credit to cardholders during the period in question (until the cardholder either paid his bill or accessed his credit reserve), Chase Lincoln necessarily incurred some cost of funds. Undoubtedly, Chase Lincoln also incurred other direct costs and overhead costs. Likewise, Chase Lincoln was exposed to the risk of loss from uncollectible accounts. Finally, there were the member-solicitation costs that were the subject of the SC-ABS and ABS-Concept agreements. Any *net* profit to be earned from Chase Lincoln's extension of credit to cardholders would have to be computed with some allowance for both Chase Lincoln's cost of funds and such other costs as were incurred by Chase Lincoln, ABS, and petitioner.

## (3) *Petitioner's Share of Expenses*

None of the agreements provides that petitioner is to bear a share of either (1) Chase Lincoln's cost of funds, (2) losses on account of uncollectible accounts, or (3) any direct or overhead costs.

Section 4.2 of the SC-ABS agreement provides that, with one exception, the cost of soliciting members is to be borne by ABS, and SC is not to be liable for any such costs. Section 4.3 of the SC-ABS agreement allows petitioner to elect to pay certain solicitation costs in consideration of receiving a larger fee. Apparently, petitioner did not make that election. Petitioner's fee for participating in the program is established by the SC-ABS agreement.

partnership: "Generally, the most important factor is evidence that the participants in an arrangement intended to join together to make and share profit as coproprietors." 1 McKee et al., Federal Taxation of Partnerships and Partners, par. 3.02[2] (2d ed. 1990).

Petitioner's fee is, in part, a function of the dollar amount of purchases made by members with the card: "total cardholder sales volume". Petitioner's fee initially was set at 0.5 percent of total cardholder sales volume.[12] Petitioner's fee could equal a greater or lesser percentage of total cardholder sales volume. The fee received by petitioner was dependent on the fee received by ABS from Concept, which, in turn, was dependent on the fee received by Concept from Chase Lincoln. To reflect the cost of funds to Chase Lincoln, petitioner's fee from ABS would increase if Chase Lincoln's cost of funds (based on the cost of 91-day Treasury bills) decreased. If Chase Lincoln's cost of funds increased, petitioner's fee from ABS would decrease, but only after Chase Lincoln's cost had increased by approximately 100 percent.

(4) *Petitioner's Obligation and Rewards*

Petitioner's obligation under the SC-ABS agreement is to cooperate with ABS on a continuing basis in the solicitation and encouragement of members to utilize the services provided by ABS. In consideration thereof, petitioner received a share of the gross profit from Chase Lincoln's extension of credit to cardholders. Undoubtedly, it was in petitioner's financial interest for the affinity card program to succeed. Petitioner's participation in that success, however, was limited to participating in the growth of total cardholder sales volume. To be sure, petitioner's profit would increase if Chase Lincoln's cost of funds decreased. Nevertheless, because Chase Lincoln's cost of funds was measured by the cost of 91-day Treasury bills, that was not something within the control of Chase Lincoln, ABS, or petitioner. Petitioner had no right to share in any increased discount Chase Lincoln might negotiate with vendors, nor would petitioner's percentage of total cardholder sales volume decrease if that discount decreased. Significantly, petitioner did not share any of the credit risk borne by Chase Lincoln. Also, petitioner did not share in (1) any of Chase Lincoln's direct costs or overhead costs or (2) any of the costs of solicitation borne

---

[12] Petitioner received an additional fee if a cardholder made certain travel reservations or purchases. See SC-ABS agreement, attachments A, sec. 5, and B, sec. 5, above. Those provisions add nothing to change our fundamental analysis. In addition, petitioner could increase its basic fee amount if it elected to pay certain solicitation costs. See SC-ABS agreement, sec. 4.3 and attachment B. As stated in the text, apparently, petitioner never took advantage of that option.

by ABS. Petitioner bore no costs (other than its own). Even petitioner's profit percentage could not decline below 0.25 percent, no matter how high Chase Lincoln's cost of funds. On the facts before us, we are unable to conclude that petitioner possessed a mutual proprietary interest in any net profits. Simply put, petitioner's participation in the financial risk and reward factors attendant to Chase Lincoln's extension of credit to cardholders was too limited to constitute a mutual proprietary interest in the net profits of that activity. The SC-ABS agreement entitled petitioner to contingent compensation, measured in chief by total cardholder sales volume. It did not entitle petitioner to a share in the net profit of a joint venture. See, e.g., *Koss v. Commissioner,* T.C. Memo. 1989–330, affd. without published opinion 908 F.2d 962 (3d Cir. 1990) (Court found no partnership in part because petitioner "was to receive for his legal services contingent compensation measured by a percentage of the proceeds from * * * [the] sale of stock").

c. *Books of Account*

In *Luna v. Commissioner,* 42 T.C. at 1078, we listed as another factor indicative of the intent to form a partnership whether separate books of account were maintained for the venture. Such books of account would be necessary to, among other things, determine any net profit of the venture and a participant's share thereof. None of the agreements calls for the keeping of any books of account from which could be determined any net profit attributable to Chase Lincoln's extension of credit to cardholders. Sections 3.2 and 3.4 of the SC-ABS agreement require ABS to keep and maintain books and records from which petitioner's fees can be determined and, monthly, to report to petitioner total cardholder sales volume and petitioner's fee. The Concept-Chase Lincoln agreement requires Chase Lincoln, monthly, to report total cardholder sales volume and any cost of funds adjustment. Although various provisions of the agreements require certain books and records to be kept, the required books and records are inconsistent with respondent's theory of joint venture. See *supra* sec. III. A. 3. The books and records are consistent with a limited financial participation by petitioner in the affinity card program, whereby petitioner was entitled

to contingent compensation, measured by total cardholder sales volume and Chase Lincoln's cost of funds. We conclude that such books and records as were required by the agreements to be kept are inconsistent with a partnership for tax purposes.

### d. *Management and Control*

In *Luna v. Commissioner, supra* at 1078, we also listed as indicative of the intent to form a partnership whether the parties exercised mutual control over and assumed mutual responsibilities for the venture. The SC-ABS agreement requires petitioner to "cooperate" with ABS in the solicitation and encouragement of members. SC-ABS agreement sec. 2.1. It also gives petitioner control over the use of its name and marks. *Id.* sec. 3.5. ABS is made responsible for the development of promotional and marketing materials and programs. *Id.* sec. 4.2. The ABS-Concept Concept-Chase Lincoln amendment accords Chase Lincoln certain rights to assume the responsibilities and enforce the rights of ABS and Concept under the SC-ABS agreement and ABS-Concept agreement, respectively, should ABS or Concept fail to perform their duties under those agreements. The SC-Chase Lincoln agreement provides, in part, that, should ABS fail to perform under the SC-ABS agreement, Chase Lincoln has the right to assume the responsibilities and enforce the rights of ABS under the SC-ABS agreement.

The term "mutual" is used in *Luna v. Commissioner,* 42 T.C. 1067 (1964), in the sense of common or shared control. See *Arthur Venneri Co. v. United States,* 169 Ct. Cl. 74, 340 F.2d 337, 343 (1965) (lack of "equal right of control" was factor used to determine that no joint venture was formed); *Estate of Briden v. Commissioner,* 11 T.C. 1095, 1126 (1948) (no partnership was found to have existed among decedent and other persons, in part because there was no evidence that any of those persons "exercised any authority as a partner or participated in the management" of the business), affd. on other grounds sub nom. *Kirk v. Commissioner,* 179 F.2d 619 (1st Cir. 1950); 1 McKee et al., *supra* par. 3.02[5][b][iii] Participation in Management, at 3–20. Clearly cooperation among the various parties to the agreements was both called for and necessary to make the affinity card pro-

gram profitable for those parties. Their control and responsibility for the program was only common, however, to the extent specified in the agreements. By way of the ABS-Concept Concept-Chase Lincoln amendment and the SC-ABS agreement, Chase Lincoln acquired shared responsibility for the duties of ABS and Concept. The duties of the parties were otherwise discrete: e.g., no party other than Chase Lincoln could accept an application for credit (i.e., issue a credit card). Chase Lincoln's mutual responsibility for solicitation activities was limited in function and did not constitute a general delegation of authority to manage the affinity card program. Lacking any such delegation, the agreements do not otherwise establish the mutual control and responsibility indicative of a partnership for tax purposes.

e. *Other Factors*

Respondent directs us to certain of the solicitation materials sent to members in connection with the affinity card program. Respondent argues that such solicitation materials show that the program was promoted as a joint venture of petitioner and Chase Lincoln. For instance, respondent quotes from a letter sent to members under the signatures of officials of both petitioner and Chase Lincoln:

Thank you for joining with the *Sierra Club and Chase Lincoln First* in this important new program. *We* hope you'll enjoy the benefits and savings provided with your new Sierra Club Premier VISA. [Emphasis added by respondent.]

Although the solicitation materials in question could support the conclusion that petitioner and Chase Lincoln were in partnership, they equally could support the conclusion that petitioner and Chase Lincoln merely were cooperating. For that reason, we accord the solicitation materials in question little weight as a factor indicating intent to form a joint venture.

Exhibit 39–AM is stipulated to be a report from ABS to an official of petitioner concerning the status of the program. The report (a letter) is dated September 11, 1986. In part, it addresses the use of petitioner's nonprofit postage permit to mail certain solicitation materials. The report concedes that use of petitioner's permit "was probably a mistake". That may well be. In any event, we accord ABS's use of petitioner's

postage permit little weight as a factor indicating intent to form a joint venture.

### 4. *Conclusion*

Based on the various agreements described above and the other stipulated facts and exhibits, we conclude that petitioner and Chase Lincoln (or petitioner, Chase Lincoln, and ABS) did not "really and truly intend to join together for the purpose of carrying on business and sharing in the profits or losses or both." See *Commissioner v. Tower,* 327 U.S. at 287. Petitioner did not participate in a joint venture with regard to the affinity card program. Petitioner was not, on account of the affinity card program, a partner with Chase Lincoln (or Chase Lincoln and ABS) for tax purposes.

### D. *Agency*

### 1. *Respondent's Theory*

We have interpreted respondent's claim that petitioner was a joint venturer with Chase Lincoln as a claim that petitioner had a proprietary interest in certain net profits originating from Chase Lincoln's extension of credit to cardholders. See *supra* III. C. 3. b. (2). The gist of respondent's agency claim is somewhat different. It is that promoting and marketing the credit provided by Chase Lincoln and the other services to be provided by ABS was petitioner's business, conducted with the help of ABS as its agent.[13] Respondent would, thus, put petitioner in the sales business, with petitioner, in effect, selling both Chase Lincoln issued credit cards and other services in consideration for contingent compensation based on member purchases. As respondent puts it:

Rather than authorizing or licensing use of SC's name and logo, * * * [the SC-ABS agreement] imposed duties upon ABS to perform certain services for SC's membership under SC's direction. The contract also imposed on SC a duty to cooperate with ABS in soliciting and encouraging members to utilize the services. Because ABS was acting as SC's agent in conducting SC's business, SC was using its name and logo in its own business * * *. Exploitation of one's own name and logo in one's own business does not give rise to royalty income. [Respondent's memorandum in support 14–15.]

---

[13] Respondent's memorandum in support 18.

## 2. *NCAA and FOP*

In *NCAA v. Commissioner,* 92 T.C. 456 (1989), revd. 914 F.2d 1417 (10th Cir. 1990), we considered whether income received by the National Collegiate Athletic Association (NCAA) in connection with the publication of programs for its annual men's basketball championship tournament constituted UBTI. The income in question was net income from program advertising. NCAA had entered into a contract with a publisher granting the publisher the right to print and publish as "co-publisher" with NCAA the programs in question. We identified as the "pivotal question" before us "whether * * * [the publisher's] activities should be attributed to petitioner for purposes of determining whether petitioner regularly carried on the business of selling program advertising." *Id.* at 466. We looked to the contract in question (the contract) to determine the nature of the publisher's relationship with NCAA. We found that the contract expressly provided that the publisher was NCAA's "exclusive agent for the sale of advertising to be included" in the programs. *Id.* at 467. We did not accept that designation as conclusive, however, but examined the terms of the contract to determine the nature and consequence of the publisher's duties. We concluded that the contract:

manifested an intent (1) that * * * [the publisher] would act on petitioner's behalf in conducting the sale of advertising and (2) that petitioner could control * * * [the publisher's] activities, elements of an agency relationship. * * * [*Id.*]

The contract provided that (1) NCAA was to receive 51 percent of net revenues, subject to a minimum of $50,000, and (2) NCAA was to be indemnified against losses. We discounted the loss limitation aspects of those provisions. We concluded that the publisher was NCAA's agent for the carrying on of an unrelated trade or business.

In *Fraternal Order of Police v. Commissioner,* 87 T.C. 747 (1986), affd. 833 F.2d 717 (7th Cir. 1987), we faced a similar issue. We concluded that the taxpayer's share of the gross advertising revenues in question was not merely royalty income received in consideration for the right to exploit the taxpayer's name. We so concluded because:

under the various agreements with * * * [a publisher] petitioner had final authority over the content of any issue of The Trooper and had the right to provide its executive editor, to select the subject matter of and prepare its editorials and feature articles, to oversee and monitor the solicitor's activities in the advertising program, to control the program's bank account, and to control the reprint of any material published in The Trooper. [*Id.* at 758.]

We did not specifically consider whether the publisher was an agent of the taxpayer's.

### 3. *Question Presented*

The SC-ABS agreement (sometimes the agreement) is an agreement to market certain financial services to members of petitioner. In consideration of petitioner's cooperation in such marketing efforts, petitioner is entitled to compensation measured by the dollars spent by members on such services. The question we must answer is whether the agreement allocates a sufficient portion of the risks and rewards of such marketing efforts to petitioner such that we must deem petitioner's compensation under the agreement, in whole or in part, to be in consideration of such marketing efforts. If so, then some, if not all, of petitioner's compensation under the agreement cannot qualify as royalty income. Important to our consideration is petitioner's control over ABS. See *NCAA v. Commissioner, supra*; *Fraternal Order of Police v. Commissioner, supra*. Put most simply, our inquiry is: Does the agreement put petitioner in the business of selling financial services?

### 4. *Recapitulation of the Agreement*

To recap pertinent portions of the agreement: Petitioner's only duty is "to cooperate with ABS on a continuing basis in the solicitation and encouragement of SC members to utilize the services provided by ABS." ABS is responsible for the development of all promotional and marketing materials and programs. Petitioner has the right to approve such materials and programs. Petitioner has the option, but not the duty, to pay the production and mailing costs ·of solicitations. If petitioner does so, its share of total cardholder sales volume will increase. Except if petitioner requests special services, it is not otherwise responsible for the cost of providing services under the agreement. Petitioner is entitled to accountings

from ABS from which it can determine total cardholder sales volume and its share thereof. ABS cannot use petitioner's name or marks without petitioner's consent. Subject to petitioner's approval, ABS is entitled to offer additional services to members. ABS is generally to hold petitioner harmless from losses except as otherwise specified. At the expiration of the agreement (but not on an event of default of ABS), ABS and Chase Lincoln may retain such records as are necessary for them to maintain customer relationships established with members. In consideration of its cooperation, petitioner is to receive a minimum of 0.25 percent of total cardholder sales volume. Petitioner is also to receive commissions if members purchase certain additional services. The agreement states that it is not to be construed as constituting an agent-principal relationship between petitioner and ABS.

5. *Analysis*

a. *Financial Risks and Rewards*

(1) *Net Profits Interest*

·The agreement anticipates both proceeds and expenses in connection with marketing credit cards to members. Nevertheless, no provision is made for the periodic determination of any net income or loss from marketing credit cards or other financial services to members. A net profits (and loss) interest in such efforts would indicate that petitioner shared in the risks and rewards of marketing and would provide a firm basis to conclude that petitioner was in the business of selling financial services. Not finding such a net profits interest, we must consider other factors.

(2) *Gross Profits Interest*

Petitioner's share of total cardholder sales volume is affected (1) by Chase Lincoln's cost of funds and (2) by whether petitioner undertakes the risk of paying direct mail or other solicitation costs. Apparently, petitioner did not undertake that risk. Except to the extent that petitioner elects to pay direct mail or other solicitation costs, or requests extraordinary services, all expenses associated with marketing credit cards to members are to be paid by ABS. Petitioner is entitled to an additional fee from ABS if mem-

bers use a special toll-free telephone number provided by ABS to make travel reservations and credit card purchases. Petitioner is required to bear none of the costs of providing that toll-free telephone number. ABS could make available other services from time to time (such as traveler's checks or a debit card) for a fee to be agreed upon. Petitioner is generally to be held harmless from losses.

Under the agreement, during the years in question, petitioner's interest in the proceeds derived from marketing financial services to members was in the nature of a gross profits interest. A gross profits interest is not inconsistent with royalty treatment of petitioner's proceeds. See, e.g., *Sabatini v. Commissioner*, 98 F.2d 753, 755 (2d Cir. 1938) (author's participation in retail trade list price) modifying and remanding 32 B.T.A. 705 (1935); cf. sec. 512(b)(2) ("There shall be excluded [from UBTI] all royalties * * * whether measured by production or *by gross or taxable income from the property"* (emphasis added)). Had petitioner exercised its option to bear some of the expenses of marketing credit cards to members, its profit interest would have increased, but it would have resembled less a gross profits interest. We might then have determined that at least some of petitioner's compensation was in consideration of petitioner's bearing the costs and risks of a sales or similar activity. Since, apparently, petitioner did not exercise that option, we do not have occasion to make that determination. We must, however, consider certain other factors.

### b. *Control*

#### (1) *Introduction*

Notwithstanding the lack of exposure that petitioner had to the financial risks associated with marketing to members under the agreement, we cannot ignore the possibility that such risks were minimal and that petitioner exerted sufficient control over ABS and the circumstances surrounding the program that, as would be true were ABS petitioner's agent, ABA's activities should be imputed to petitioner.

#### (2) *History*

The parties have stipulated certain facts concerning the history of the affinity card program. Those facts help us to

understand the context of petitioner's relationship with ABS. Apparently, the program was an idea of ABS's, not petitioner's. Indeed, the parties have stipulated that, in 1980, petitioner was "approached by, and entered into negotiations with," a predecessor of ABS. They have further stipulated that ABS's initial proposal (the initial proposal) was rejected by petitioner. The initial proposal is a comprehensive document, in excess of 26 pages in length. The initial proposal states that petitioner's only costs would be the costs of soliciting members.

A subsequent proposal made by Chase Lincoln in 1986 (the Chase Lincoln proposal) states that all marketing of the program is the responsibility of petitioner and an affiliate of ABS. The parties have stipulated that petitioner required modification of the Chase Lincoln proposal. In a letter to petitioner accompanying a modified version of the Chase Lincoln proposal, Edward Shelton, executive vice president of ABS, mentions those modifications, including that ABS will be responsible for all marketing, "subject to your advice and consent." That modification was reflected in the agreement as executed. See SC-ABS agreement sec. 4.2.

(3) *The Agreement*

The agreement imposes on ABS the responsibility for the development of all promotional and marketing materials and programs. ABS is given the initiative to develop additional services to be offered to members. Petitioner's only duty is to cooperate. Petitioner's rights to regulate ABS's performance are limited to approving (1) marketing materials developed by ABS and (2) additional services. Petitioner has no right to direct the details of ABS's performance of its duties. During the term of the agreement, ABS has a right of first refusal to provide any substantially similar services that petitioner wishes to offer to members. At the termination of the agreement (other than by ABS's default), ABS and Chase Lincoln may retain such records as are necessary for them to maintain customer relationships established with members. By its terms, the agreement seems more a cooperative arrangement than a master-servant relationship.

### (4) *Postagreement Events*

The parties have stipulated that, in March 1986 (subsequent to entering into the agreement), ABS circulated to petitioner a proposed marketing plan, schedule, and sample solicitation materials (together, the initial plan) for petitioner's review and approval. The initial plan is 22 pages long and contains drafts of (1) letters, (2) articles for petitioner's publications, (3) designs for mailing materials, (4) acknowledgement packages, and (5) other materials. The initial plan required certain approvals within a few days. Apparently, aspects of the initial plan were unacceptable to petitioner. A revised plan (the revised plan) was circulated in early April 1986. A cover letter accompanying the revised plan states: "You will note that the pitch has been toned down considerably and the letter to the leadership doesn't do anything except inform them of the Club's plans for a credit card." Also, the cover letter states that proposals for telemarketing, membership solicitation and drive packages, membership renewal packages, automatic membership renewal, and automatic monthly billing of contributions had been eliminated. It is clear that ABS had exercised a great deal of (if not total) discretion in initially designing and preparing marketing materials for petitioner's approval. Petitioner's approval, of course, indicates some control over the final product. Nevertheless, the changes that petitioner apparently did dictate seem designed to distance petitioner from the marketing effort rather than involve petitioner in it.

ABS placed advertisements for the affinity card in seven issues of petitioner's magazine. The parties have stipulated that "ABS was charged and invoiced for all advertisements in *Sierra* and the Sierra Club catalog under the same terms and price structure applicable to any unrelated advertiser." When ABS failed to pay invoices for advertisements in three issues of petitioner's magazine, petitioner notified its counsel regarding such failure to pay and efforts to collect.

ABS used petitioner's nonprofit mail permit, but acknowledged that such use was a mistake.

## 6. *Conclusion*

Our analysis of the financial risks and rewards inherent in the agreement is inconclusive. Our consideration of petitioner's control over ABS, in light of events preceding and following execution of the agreement, leads us to conclude, however, that petitioner had insufficient control over ABS's actions for such actions to be imputed to petitioner so as to put petitioner in the business of selling financial services. ABS approached petitioner, not vice versa. Petitioner required ABS to accept responsibility for soliciting members. ABS exercised discretion in meeting that responsibility. Petitioner dealt at arm's length with ABS in accepting advertising from ABS for publication in its publications. Apparently, petitioner attempted to collect from ABS when it defaulted in payment for that advertising. So long as ABS did not default under the agreement, petitioner could not control ABS and Chase Lincoln's exploitation of the relationships they developed with members during the course of the agreement. We accept that ABS's use of petitioner's mail permit was a mistake. Based on all of the above, as stated, we conclude that petitioner was not in the business of selling financial services.

## E. *License*

### 1. *Introduction*

Having determined that petitioner neither participated in a joint venture with regard to the affinity card program nor engaged in the business of selling financial services to members, we are left to determine whether the financial consideration that petitioner received pursuant to the agreement properly is to be characterized as royalties.

### 2. *Definition of Royalties*

Our report in Sierra Club I contains an extended discussion of the term "royalties", as that term is used in section 512(b)(2). We will not repeat that discussion here. Suffice it to say that we have accepted the following definition of the term "royalties" for purposes of section 512(b)(2): "payments for the use of valuable intangible property rights". *Disabled American Veterans v. Commissioner,* 94 T.C. 60, 70 (1990), revd. on other grounds 942 F.2d 309 (6th Cir. 1991).

### 3. *Petitioner's Position*

Pursuant to section 2.1 of the agreement, petitioner is obligated "to cooperate with ABS on a continuing basis in the solicitation and encouragement of SC members to utilize the Services provided by ABS". In consideration thereof, pursuant to section 4.1 of the agreement, ABS agrees to pay to petitioner "a royalty fee". Petitioner argues that the agreement constitutes a license of its name and logo, and permission to use its membership mailing list, for which it received "royalties", as that term is used in section 512(b)(2).

### 4. *Respondent's Position*

Respondent's position is fundamentally inconsistent with the notion that petitioner received *anything* (whether as a royalty or otherwise) from ABS pursuant to the agreement. Respondent insists on her agency theory: "Because it was SC's business, use of SC's name and logo in connection therewith did not give rise to royalty income."[14] "In reality," respondent explains, "SC was paying ABS for performing services in connection with the * * * [agreement]."[15] Respondent further insists that the agreement is "unambiguous in *not* creating a licensing agreement for the use of SC's name, logo or mailing list."[16] If the Court determines any ambiguity in the agreement, respondent argues that there is thus a material fact at issue and a trial is required.[17]

### 5. *Analysis*

#### a. *Ambiguity*

We do not agree with respondent that the agreement unambiguously excludes the possibility that petitioner was being compensated for use of valuable intangible property rights. We have rejected respondent's theory that, through ABS, petitioner's agent, petitioner was in the business of selling financial services. Nevertheless, we do not believe that respondent has raised a genuine issue as to a material fact, requiring a trial. In consideration of its admittedly vague duties under the agreement, petitioner was to receive certain

---

[14] Respondent's memorandum objecting 2.
[15] *Id.* at 4.
[16] Respondent's objection 2.
[17] Respondent's memorandum objecting 4.

contingent amounts. Whether the agreement constitutes a licensing agreement is at least a mixed question of fact and law. As to the factual component of that question, respondent cannot simply deny the facts relied on by petitioner, but must "set forth specific facts showing that there is a genuine issue for trial." Rule 121(d); *Morrison v. Commissioner,* 81 T.C. 644, 650–651 (1983). In her notice of objection, respondent sets forth certain "UNRESOLVED FACTUAL ISSUES". Respondent contests petitioner's assertions that the agreement constitutes (1) a licensing agreement for its name and logo and (2) permission to use its mailing list. In support of respondent's first denial (not a licensing agreement), respondent does no more than offer the agreement.[18] In support of her second denial (not permission to use mailing list), respondent offers the agreement and other stipulated exhibits.[19] Necessarily, our focus is on interpreting the agreement. Neither party has offered up anything but the agreement and certain stipulated exhibits to aid in that interpretation. Respondent has not set forth any facts to be presented to us that are not already before us. On that basis, we believe that we can interpret the agreement for purposes of this case without benefit of trial. As will be set forth below, the terms of the agreement, interpreted in light of certain stipulated exhibits relative to events both preceding and following execution of the agreement, lead us to conclude that petitioner did, indeed, receive payment for valuable intangible property rights pursuant to the agreement. We conclude that there is no genuine issue as to any material fact that prevents us from rendering a decision as a matter of law. See Rule 122(b).

b. *Question Presented*

The parties have stipulated that, for 2 of the years in issue, petitioner had receipts from the affinity card program. We assume that those receipts were received pursuant to section 4.1 of the agreement. The question we must answer is whether those receipts were in consideration of the use of valuable intangible property rights. See *Disabled American*

---

[18] Respondent's objection 6.

[19] *Id.* 9.

*Veterans v. Commissioner, supra* (definition of royalties for purposes of section 512(b)(2)).[20]

c. *The Agreement*

In so many words, the agreement neither (1) licenses petitioner's name or mark to ABS nor (2) grants ABS permission to use petitioner's mailing list. On its face, the agreement is simply an agreement for ABS to market certain services to members and for petitioner to cooperate in that effort. Implicit in that agreement, however, is that ABS will be allowed access to members. Indeed, we think that such access is a key component of ABS' rights under the agreement. We think so for the following reasons: The parties have stipulated that petitioner provided lists of its members directly or indirectly to ABS in connection with the program. The agreement recites that the parties thereto "desire to make available to the members of SC" the services to be offered by ABS. The agreement entitles ABS to offer additional services to members (sec. 3.3) and, if ABS defaults, requires ABS to cease communicating with members (sec. 9). Petitioner has the option, which, apparently, it did not exercise, to pay for direct mail or other solicitation efforts (sec. 4.3). In light of petitioner's obligation to cooperate with ABS, we do not see that option as limiting ABS' right to make services available to members, but only as allocating the cost (and related profit) relating to actual solicitation efforts.[21] Thus, notwithstanding the lack of particular language setting forth ABS' right of access to petitioner's membership (by way of its mailing lists), we think it clear that such access is a key component of ABS' rights under the agreement.

We also have no doubt that the parties had in mind the use by ABS of petitioner's name and marks in connection with ABS' marketing efforts under the agreement. The description of services attached to the agreement (attachment A) recites

[20] Pursuant to the agreement (attachment B), petitioner was entitled to (1) a percentage of total cardholder sales volume and (2) an additional percentage of certain sales of travel services. We perceive no different issue between those two classes of receipts and, consequently, no need to distinguish between them in our analysis.

[21] For the same reason, we make little of the last sentence of sec. 7.1 of the agreement: "ABS agrees that it acquires no right under this Agreement to inspect, copy or gain possession of any list of members of SC or any part thereof." The soul of the agreement is that ABS is entitled to market certain services to members. We view the sentence in question as limiting ABS' property rights in the list, and not as a prohibition on use of the list or a denial of access to members for purposes of solicitation.

that members that become cardholders will receive a credit card with the name of petitioner on one side and a "logo or other design of SC" on the reverse side. Also, if ABS defaults, it must immediately cease using petitioner's name and marks (sec. 9). In light of those provisions, we view ABS' agreement that it will obtain prior written consent from petitioner for use of its name or marks (sec. 3.5) as a provision regulating ABS' use of those items (and preserving petitioner's property interests therein), rather than as a negation that the agreement dealt with such use. Similarly (and as discussed more fully below), we view petitioner's right to advise and consent with regard to the marketing materials prepared by ABS (see sec. 4.3 of the agreement) as a right intended to safeguard and preserve the worth of petitioner's good name. As with ABS' access to petitioner's membership lists, we think that use of petitioner's name and marks was a key component of ABS' rights under the agreement.

Although we think it clear that petitioner's duty of cooperation under the agreement includes making available for ABS' use petitioner's name, marks, and mailing lists, we do not read the agreement as prohibiting other forms of cooperation. We have rejected respondent's argument that ABS was petitioner's agent, so as to put petitioner in the business of marketing financial services to members. Other than with regard to the use of petitioner's mail permit, respondent has made no factual allegations that petitioner participated directly in any marketing efforts.

d. *Pre- and Post-agreement Events*

Stipulated exhibits include (1) certain pre-agreement correspondence relating to the program and (2) marketing plans and related items prepared after the agreement was executed. We have examined those items, and they do not lead us to believe that, other than as described, petitioner participated in marketing efforts directed to its members. We have already considered the history of the program (see *supra* sec. III. D. 5. b. (2)). That history convinces us that petitioner intended not to be responsible for marketing efforts with regard to the program, except to exercise its "advice and consent" with regard to ABS' efforts in that regard. See *supra* sec. III. D. 5. b. (2). We have also consid-

ered petitioner's post-agreement exercise of its advice and consent rights. See *supra* sec. III. D. 5. b. (4). As a result of that exercise, the "pitch" of ABS' marketing proposals was "toned down", and proposals for telemarketing, membership solicitation and drive packages, membership renewal packages, automatic membership renewal, and automatic monthly billing of contributions were eliminated from the marketing plan. See *id.* Under the agreement, the responsibility for developing marketing materials was ABS' (sec. 4.3). ABS' presentation of its initial marketing plan (the initial plan) and petitioner's response to the initial plan were accomplished in a relatively short period, and we do not take petitioner's exercise of its discretion as a disguised attempt to exercise creative or production control over ABS' efforts. Moreover, we do not find the existence, or exercise, of petitioner's rights to be inconsistent with a royalty arrangement. In *Wm. J. Lemp Brewing Co. v. Commissioner*, 18 T.C. 586 (1952), we dealt with an agreement that allowed a party to manufacture and sell beer under an old family name used by the taxpayer. The agreement reserved to the taxpayer a right of approval over methods of brewing, advertising, and the marketing of beer that would carry that name. We stated:

> The significance of such provision, when read in the light of the entire agreement, is that petitioner, having licensed the use of its formulae and trade name, desired to retain the right to supervise the methods of brewing, advertising, and marketing of beer sold under the "Lemp" name for the protection and preservation of what petitioner considered a valuable property right. Since the license granted was for an indefinite period, and could be canceled by * * * [the licensee] at will, such a protective provision was a most desirable one. * * * [*Id.* at 596.]

We stated that the fact that the taxpayer's officers conferred and cooperated with the officials of the licensee in carrying out the spirit of the provision did not indicate to us that the parties intended to engage in the manufacture and sale of beer as a joint venture. *Id.* We found that payments made pursuant to the agreement were royalties. *Id.* at 597; see also *Disabled American Veterans v. Commissioner*, 94 T.C. 60 (1990). Likewise, here, when viewed in light of the agreement and the correspondence that preceded it, we conclude that petitioner's exercise of its right to advise and consent with respect to ABS' marketing proposals signifies what

we assume to be petitioner's concern with protecting the worth of its property interest in its good name and marks and is not a indirect method to putting petitioner in the business of marketing to members.[22]

In her various papers (see, e.g., respondent's memorandum in support 2, 17–18), respondent refers to ABS' default under the agreement in December 1987, petitioner's refund to members of certain annual fees (see agreement sec. 2.4), and bank charges incurred by those members. Respondent cites such actions in support of her theory that petitioner controlled ABS and, therefore, petitioner made no royalty payments to ABS. ABS' default took place after the years here in question. The exhibits respondent refers to in support of her argument are not among those stipulated and have been objected to by petitioner. Even were we to accept respondent's exhibits at face value, we do not believe that they show control over ABS' marketing efforts. Rather, we think that such exhibits, and the conduct that they reflect, are consistent with petitioner's protection of its good name. Apparently, the following occurred. Members were promised by ABS that, for their second year of participation in the program, they would receive a rebate of the annual fee charged by Chase Lincoln. Rebate checks issued by ABS were not honored. ABS was then in default under the agreement. Petitioner took some responsibility for arranging refunds to members. The actions alleged of petitioner we believe to be consistent with petitioner's insuring that promises were kept that may have been made in petitioner's name. Petitioner does not appear to have been obligated to make the refunds in question, and we believe that it acted solely to protect its good name. Such actions are consistent with the licensing arrangement claimed by petitioner.

As previously stated, we accept that ABS' use of petitioner's mail permit was a mistake.

---

[22] Respondent has not argued that petitioner and ABS were engaged in a joint venture to market to members. For substantially the same reasons stated above in our analysis of respondent's claim that petitioner and Chase Lincoln (and, perhaps, ABS) were engaged in a joint venture, we do not believe that petitioner and ABS were engaged in a joint venture. See *Wm. J. Lemp Brewing Co. v. Commissioner*, 18 T.C. 586, 587 (1952) (similar question; important factor is lack of sharing of joint profit).

### 6. *Conclusion*

On the basis of the agreement and stipulated exhibits, we conclude that the agreement made available for ABS' use petitioner's name, marks, and mailing list. Such items are intangible property, and the financial consideration received by petitioner under the agreement was in consideration of such use. Such financial consideration was not in consideration of services performed by ABS or property other than valuable intangible property. Such consideration thus constitutes royalties within the meaning of section 512(b)(2). See *Disabled American Veterans v. Commissioner*, 94 T.C. at 70; Sierra Club I.

## IV. *Conclusion*

Petitioner has moved for partial summary judgment that its income from the affinity card program for the years in dispute constituted royalties within the meaning of section 512(b)(2). Respondent has objected on the grounds that (1) her own motion for partial summary judgment (to the contrary) should be granted and (2) alternatively, there are unresolved genuine issues of material fact requiring a trial. We have decided that there is no genuine issue as to any material fact requiring a trial. We have also decided that the income in question *did* constitute royalties within the meaning of section 512(b)(2) and *did not* constitute either (1) a share of profits from selling credit card goods and services received by petitioner as a joint venturer with Chase Lincoln (or with Chase Lincoln and ABS) or (2) payments for services performed as a sole proprietor by petitioner in connection with its activities in marketing and endorsing its credit card. Accordingly, we will grant petitioner's motion for partial summary judgment and, by necessity, deny respondent's motion for partial summary judgment.

*An appropriate order will be issued.*