T.C. Memo. 1999-86


UNITED STATES TAX COURT


SIERRA CLUB, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]


Docket No. 8650-91.                    Filed March 23, 1999.


On remand from the Court of Appeals for the Ninth
Circuit. <u>Sierra Club, Inc. v. Commissioner</u>, 86 F.3d
1526 (9th Cir. 1996), affg. in part, revg. in part
and remanding 103 T.C. 307 (1994) and T.C. Memo.
1993-199. The Court of Appeals remanded for findings
of fact whether P's income from the affinity card
program, which was the subject of our report at 103
T.C. 307, constituted "royalties" within the meaning
of sec. 512(b)(2). <u>Held</u>, the receipts constitute
"royalties" within the meaning of sec. 512(b)(2).


<u>Robert L. Dietz</u>, and <u>B. Holly Schadler</u>, for petitioner.

---

*   This report supplements our report in <u>Sierra Club, Inc, v.
Commissioner</u>, 103 T.C. 307 (1994), revd. and remanded 86 F.3d
1526 (9th Cir. 1996).

Stephen M. Miller, Diane I. Crosby, Judith Cavell Cohen, William A. Goss, and Donald W. Williamson, Jr., for respondent.

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge: This case is before the Court on remand from the Court of Appeals for the Ninth Circuit (the Ninth Circuit). Sierra Club, Inc. v. Commissioner, 86 F.3d 1526 (9th Cir. 1996) (Sierra Club (1996)), affg. in part, revg. in part and remanding 103 T.C. 307 (1994) and T.C. Memo. 1993-199. The Ninth Circuit reversed our order granting petitioner's motion for partial summary judgment. That order was issued pursuant to our report in Sierra Club v. Commissioner, 103 T.C. 307 (1994) (Sierra Club (1994)) revd. and remanded 86 F.3d 1526 (9th Cir. 1996). In Sierra Club (1994), we concluded that petitioner's receipts from the affinity credit card program there described did not constitute "unrelated business taxable income" within the meaning of section 512(a)(1) because they constituted "royalties" within the meaning of section 512(b)(2). The Ninth Circuit determined that we had improperly resolved disputed factual issues in favor of petitioner, and it remanded for findings of fact whether the receipts in question constitute "royalties" within the meaning of section 512(b)(2).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

We shall not here repeat the preliminaries concerning respondent's determinations and other matters set forth in our prior reports.

FINDINGS OF FACT

Introduction

Some of the facts have been stipulated and are so found. The stipulations of facts filed by the parties, with attached exhibits, are incorporated herein by this reference.

Affinity Card Programs

An affinity credit card program is an arrangement by which an organization agrees with a credit card issuer that the organization's name and logo may appear on a credit card and, thus, be used to market the card to an affinity group associated with the organization.  The organization receives a small percentage of total amounts charged on the card.

History of the Affinity Card Program

In 1980, petitioner was approached by Edward Shelton, president of Shelton Financial Services (Services), who proposed an affinity card program to petitioner, with a credit card to be marketed to petitioner's members and supporters (hereafter, without distinction, the members).  Negotiations between petitioner and Services continued for almost 6 years.  During that period, Services changed its name to American Bankcard Services (ABS).  On January 10, 1986, ABS submitted to petitioner a proposal by Chase Lincoln First Bank, N.A. (Chase Lincoln), for an affinity card program.  Among other things, Chase Lincoln's

proposal provides: "Chase Lincoln First would own all cards and accounts in their entirety. We would provide all services in connection with the card program except marketing." In pertinent part, ABS's submission provides: "[In the proposal], there is a reference to marketing being the responsibility of the Sierra Club and * * * [an affiliate of ABS]. * * * Pursuant to our agreement with the Sierra Club, American Bankcard will be responsible for all marketing subject to your advice and consent."

The Sierra Club-American Bankcard Services, Inc., Agreement

On February 20, 1986, petitioner entered into an agreement with ABS, the "Sierra Club Bankcard Agreement" (SC-ABS agreement), which concerns itself with the provision of a credit card (the credit card) and certain other financial services to the members.

In pertinent part, the SC-ABS agreement provides as follows:

> SC and ABS desire to make available to the members of SC one or more packages of financial services upon the terms and conditions hereinafter set forth.
>
> NOW, THEREFORE, it is agreed by the parties hereto as follows:
>
> ARTICLE 1. The Services
>
> ABS proposes to offer members of SC the product and service options set forth in Attachment "A" hereto (* * * the "Services").
>
> ARTICLE 2. SC Participation
>
> 2.1 SC agrees to cooperate with ABS on a continuing basis in the solicitation and encouragement

of SC members to utilize the Services provided by ABS, all as more specifically described herein.

* * * * * * *

2.3  ABS has entered into a written agreement whereby Chase Lincoln First Bank, N.A. of Rochester, New York ("Chase Lincoln") has agreed to act as a financial institution to issue bankcards for SC.  SC has selected Chase Lincoln as the financial institution to be the issuer of Sierra Club bankcards under this Agreement.  * * *

2.4  Chase Lincoln has represented to ABS that the membership fee customarily charged cardholders by Chase Lincoln will be waived for all SC members for the first year of the term of this Agreement.  ABS will attempt to obtain from Chase Lincoln, or from any successor financial institution selected by SC, a waiver of such membership fee for each year of the initial four year term of this agreement.  In the event ABS is unable to obtain a waiver of such membership fee, ABS will pay to SC, and SC will refund to participating members, the membership fee charged such members during each year of the term of this Agreement.

ARTICLE 3.  Program Control

* * * * * * *

3.2  ABS shall provide SC with monthly computer reports which set forth the Total Cardholder Sales Volume, as defined in Attachment "B" hereto, and the royalty fees payable to SC.

3.3  ABS shall be entitled to offer to SC members who select one of the options in Attachment "A" such other services or products as are mutually agreed upon from time to time between the parties hereto and for which mutually agreed upon compensation is paid to SC.

3.4  ABS shall keep and maintain true, correct and complete books of account and records from which SC royalty fees can be determined.  * * *  SC shall have the right at any time to examine, inspect, and audit all such books and records, and all such other papers and files of ABS relating to the performance of this Agreement.

3.5  ABS agrees that it will not use or permit to be used the SC name or marks without prior written consent in each and every instance.

ARTICLE 4.   Sharing of Income and Expense

4.1  ABS agrees to remit or cause to be remitted to SC on a monthly basis throughout the term of this Agreement a royalty fee calculated in accordance with Attachment "B".   * * *

4.2  ABS shall be responsible for the development of all promotional and solicitation materials and programs designed to encourage the acquisition and usage of the Services by the members of SC subject to the approval by SC of all such materials and programs. The cost of such materials and programs shall be borne by ABS, and SC shall not be liable for any costs related thereto with the exception specified in Section 4.3 below.  SC shall cooperate fully with ABS in encouraging the acquisition and use of the Services.

4.3  SC may elect to pay for the production and mailing costs associated with direct mail or other solicitations to its members to encourage their acquisition and use of the Services.  In the event SC so elects, the royalties payable by ABS shall be adjusted as provided in paragraph 2 of attachment "B".

4.4  ABS, its agents, or participating financial institutions shall be responsible for all expenses associated with the Services except for any non-Service related matters requested by SC such as special mailings, special printouts or other similar actions not part of bankcard routine operations. * * *

ARTICLE 5.   Term of Agreement

* * * [four years plus renewal periods] * * *

ARTICLE 6.   Hold Harmless

6.1  ABS agrees to indemnify and hold SC and each and every participating SC member harmless from any and all direct or contingent liabilities, claims, damages, losses and expenses arising directly or indirectly from the activity of ABS, its agents, or participating financial institutions in participating in the program except for such expenses as are specified in Sections 4.3 and 4.4, and interest and other normal bankcard charges against cardholders for the Services.

6.2  SC agrees to indemnify and hold ABS, its agents, and participating financial institutions harmless from any and all direct or contingent liabilities, claims, damages, losses and expenses arising from SC activities in participating in the program to the extent that the same are the result of SC gross negligence or wilful misconduct.

6.3 Nothing in this Agreement shall be construed as constituting a partnership or agent/principal relationship between the parties.

ARTICLE 7.  <u>Confidentiality</u>

7.1  ABS agrees that in the event of the termination of this Agreement, all data, documents and information pertaining to SC members will be returned forthwith to SC; provided however that ABS, its agents, or participating financial institutions may retain copies of any materials required to properly control and handle any established customer relationships.  ABS agrees that it acquires no right under this Agreement to inspect, copy or gain possession of any list of members of SC or any part thereof.

7.2  ABS agrees that any and all information provided by SC shall be the sole property of SC, and shall not be used, transferred, reproduced or otherwise dealt with by ABS, its agents or any participating financial institution except under terms and conditions approved by SC.

*    *    *    *    *    *    *

ARTICLE 8.  <u>Exclusivity</u>

*    *    *    *    *    *    *

ARTICLE 9.  <u>Event of Default</u>

In the event ABS fails to perform any of its obligations under this Agreement, SC shall give notice of such event ("Event of Default") to ABS.  If ABS has not cured the Event of Default within 10 days after receipt of notice, SC may, in addition to its remedies at law or in equity, terminate this Agreement.  If this Agreement terminates by expiration of the term set forth in Article 5 or pursuant to the provisions of Section 2.3 [sic], ABS and participating financial institutions may retain such records as are necessary in order for them to maintain any customer

relationships established hereunder with any SC member. In the event this Agreement is terminated pursuant to this Article 9, notwithstanding any provision of this Agreement to the contrary, ABS shall, and ABS shall cause its agents and all participating financial institutions to, immediately (1) cease using the Sierra Club name and marks, (2) cease communicating with SC members except to the extent necessary to terminate the Services, and (3) return to SC all records relating to the performance of this Agreement, and all copies thereof, and make no effort to communicate with SC members thereafter.

ARTICLE 10.  Notices

*     *     *     *     *     *     *

ATTACHMENT "A"
DESCRIPTION OF AFFINITY GROUP BANKCARD PROGRAM

1.  Qualified members of SC will be issued Sierra Club Visa and/or Mastercard [sic] credit cards which contain the standard bankcard design (either Visa or MasterCard) along with the name of SC on one side and the logo or other design of SC on the reverse side, as approved by Visa, USA or MasterCard International.

2.  Annual fees for the cards will be waived for the first year, and fees for the second year may be initiated only after an evaluation of the profitability of the program by the participating financial institution.  In the event the participating financial institution initiates an annual fee in the second year, ABS will pay those fees on behalf of the cardholders.

*     *     *     *     *     *     *

5.  If the cardholder uses a special 800 number provided by ABS to make travel reservations and purchases using his Sierra Club bankcard, an additional royalty fee as set forth in Attachment "B" will be paid to SC.

6.  Other enhancements such as Visa or MasterCard Travelers Checks and the ABS Universal Debit Bankcard will be made available to cardholders from time to time pursuant to mutually agreed upon royalty fees payable to SC.

ATTACHMENT "B"
ROYALTY FEE SCHEDULE

1.  The royalty fee payable to SC shall be one half of
one percent (0.5%) of the Total Cardholder Sales Volume
if the fees received by ABS from the participating
financial institution are between 0.5% and 1.0% of the
Total Cardholder Sales Volume.  Total Cardholder Sales
Volume is defined as the sum of all SC bankcard sales
drafts resulting from purchases at merchants by members
of SC using SC bankcards net of credit vouchers issued
for returned merchandise or other services, and net of
cash advances.

2.  If SC elects to pursue the option specified in
Section 4.3 of this Agreement and if the fees received
by ABS from the participating financial institution are
between 0.6% and 1.0% of the Total Cardholder Sales
Volume, the royalty fee specified in Section 1. of this
Attachment "B" shall be increased to six tenths of one
percent (0.6%) of the Total Cardholder Sales Volume.

3.  If the fees received by ABS from the participating
financial institution are more than 1.0% of the Total
Cardholder Sales Volume, the fee payable to SC, whether
otherwise 0.5% or 0.6%, shall be increased by an amount
equivalent to 50.0% of the fees payable to ABS in
excess of 1.0%.

4.  If the fees received by ABS from the participating
financial institution are less than 1.0% of the Total
Cardholder Sales Volume, but more than 0.5% (or, in the
event SC elects the option referred to in Paragraph 2.
above, more than 0.6%), there will be no decrease in
the fees payable to SC under Paragraph 1. or 2. above.
However, if the fees received by ABS are less than 0.6%
or 0.5% (whichever is otherwise payable to SC), the
fees payable to SC will be the total fees received by
ABS from the participating financial institution.

5.  When SC members use the 800 number travel service
described in Section 5. of Attachment "A", SC will be
paid a royalty of three percent (3.0%) of the price of
airline tickets purchased with the Sierra Club
bankcards and fifty percent (50.0%) of the hotel and
car rental commissions received by the participating
travel agency.  These royalties are in addition to the
royalties specified in Section 1., 2., 3., or 4. of
this Attachment "B".

ABS-Concept I, Inc., Agreement

Concept I, Inc. (Concept), a Massachusetts corporation, is the party that brought Chase Lincoln to the attention of ABS as a bank willing to issue the credit card. On March 9, 1986, ABS entered into an agreement with Concept (the ABS-Concept agreement), which concerns itself with ABS's rights and duties under Article 4 of the SC-ABS agreement to solicit the members with respect to the credit card. The ABS-Concept agreement recites that ABS desires to assign those rights and duties to Concept. Among other things, the ABS-Concept agreement provides that (1) by doing so, ABS intends to satisfy its obligations with respect to solicitation under the SC-ABS agreement and (2) Concept and Chase Lincoln have entered into an agreement pursuant to which Chase Lincoln has agreed to act as the financial institution that will issue the credit card. Concept's obligations under the ABS-Concept agreement are tied to its rights and obligations under its agreement with Chase Lincoln.

Concept-Chase Lincoln Agreement

On March 28, 1986, Concept entered into an agreement with Chase Lincoln. That agreement (the Concept-Chase Lincoln agreement) makes reference to both the SC-ABS agreement and the ABS-Concept agreement and recites that Chase Lincoln is willing to serve as the issuing financial institution with respect to the "Card Program" contemplated in the SC-ABS agreement (the credit card program). Among other things: Concept agrees to solicit (or cause to be solicited) the members for participation in the

credit card program. Concept must submit to Chase Lincoln for approval all promotional material containing the name of the bank. Chase Lincoln agrees to issue to qualified members its Premier Visa Card. Such cards, as well as any indebtedness or other customer relationships resulting from use of the cards, become and remain the property of the bank. Information supplied by members to the bank in connection with the credit card program becomes the property of the bank upon the issuance of a card to the member, for use in the bank's sole discretion in the normal course of conducting its business. The bank agrees, however, that it will not disclose the fact that any participant in the credit card program is a member. Chase Lincoln agrees to waive the normal annual membership fee for the card for each member's first year of membership and to charge a reduced membership fee, no more than $30, for each subsequent year of membership. The bank agrees to pay to Concept a fee based on purchases made by members with a card. That fee will also vary depending on Chase Lincoln's cost of funds, which is determined with reference to the published discount rate applicable to 91-day U.S. Treasury bills. In no event, however, can the fee paid by Chase Lincoln to Concept decrease below 0.25 percent of the total purchases made by members with a card. Petitioner's interest in the agreement is acknowledged.

Amendment to ABS-Concept Agreement and Concept-Chase Lincoln
Agreement

On March 28, 1986, the ABS-Concept agreement and the

Concept-Chase Lincoln agreement were amended (the ABS-Concept

Concept-Chase Lincoln amendment) such that (1) should ABS fail to

perform under the SC-ABS agreement, (2) should Concept fail to

perform under the ABS-Concept agreement, or (3) should both ABS

and Concept fail to perform under such agreements, Chase Lincoln

has the right to assume the responsibilities and enforce the

rights under such agreements.

SC-Chase Lincoln Agreement

On March 26, 1986, petitioner and Chase Lincoln entered

into an untitled agreement (the SC-Chase Lincoln agreement) that

references the SC-ABS agreement.  Among other things, the

SC-Chase Lincoln agreement provides that (1) should ABS fail to

perform under the SC-ABS agreement, Chase Lincoln has the right

to assume the responsibilities and enforce the rights of ABS

under that agreement and (2) during the term of the agreement

(until March 28, 1988, unless extended) petitioner will not

authorize any other bank to issue Visa credit cards to its

members.

ABS-Concept Modification

By letter dated July 7, 1986, the ABS-Concept agreement was

amended and modified (the ABS-Concept modification).  Among other

things, the letter provides that (1) Concept's duties to solicit

members are reassigned back to ABS and (2) to compensate Concept

for obtaining a bank issuer for the credit card program, Concept may retain a portion of the payments it receives from Chase Lincoln.

Member Lists

Petitioner develops and maintains mailing lists with respect to the members composed of names, addresses, and related information. Petitioner has exclusive ownership rights in its mailing lists, including the right to all net income from such lists.

On April 14, 1986, petitioner provided ABS a magnetic tape containing an initial list of the members. Subsequently, on seven occasions, petitioner provided ABS labels containing the names and address of new members.

Marketing Plans and Solicitations

In March 1986, ABS circulated to petitioner a proposed marketing plan, schedule, and sample solicitation materials (together, the initial plan) for petitioner's review and approval. Petitioner objected to certain aspects of the initial plan. A revised plan (the revised plan) was circulated within petitioner's organization in early April 1986. A cover letter accompanying the revised plan states: "You will note that the pitch has been toned down considerably and the letter to the leadership doesn't do anything except inform them of the Club's plans for a credit card." Also, the cover letter states that proposals for telemarketing, membership solicitation and drive packages, membership renewal packages, automatic membership

renewal, and automatic monthly billing of contributions had been eliminated.

ABS initially solicited petitioner's members with respect to the credit card program in a communication dated June 15, 1986 (the June 15 communication). The June 15 communication contains letters on Sierra Club stationery, with facsimile signatures by officers of petitioner, informing members of "a new member service" and of the benefits both to members and to petitioner ("royalty fees"). An enclosed brochure invites communication with ABS and states:

> American Bankcard Services, Inc. is an independent California corporation organized to provide bankcards to the members of various national Affinity Groups as a unique member service and fund raising opportunity. American Bankcard has contracted with the Sierra Club in order to make Sierra Club VISA cards available to members of the Club.

Members are instructed to mail their applications to Chase Lincoln. The June 15 communication was mailed to members using petitioner's nonprofit postage permit. ABS paid for the June 15 communication, including the costs of design, printing, business reply envelopes, postage, and mailing labels.

After a member's application was accepted, the member received a letter congratulating the member "for joining with the Sierra Club and Chase Lincoln First in this important new program" and stating: "The added income to the club [sic] from your use of the card will certainly benefit the Club in its continuing efforts to improve our environment, to keep endangered species alive and to save the wilderness." That letter

contained the letterheads of both petitioner and Chase Lincoln and facsimile signatures of officers of both organizations. ABS paid all of the costs of that letter.

Advertisements

Advertisements for the credit card program appeared in three issues of petitioner's magazine, Sierra, during each of 1986 and 1987. Those advertisements (the advertisements) were designed by JMP Marketing and Design, a design agency retained by ABS. The advertisements instructed petitioner's members to submit applications to Chase Lincoln and to direct questions to ABS. ABS was billed for the advertisements at the same prices and on the same terms as applicable to any unrelated advertiser. ABS failed to pay amounts billed to it for the 1987 advertisements in the amount of $8,230. Petitioner attempted to collect that amount but was unsuccessful.

ABS also placed advertisements for the credit card program in publications of local chapters of petitioner. ABS paid for those advertisements and received no discount from the rates charged others.

Administration of the Program

Petitioner did not maintain individual files concerning each member's participation in the credit card program. The credit card program was administered, and records kept, by ABS and Chase Lincoln. Members' complaints and inquiries with respect to the credit card program were directed to ABS or Chase Lincoln.

Termination of the SC-ABS Agreement

By the Concept-Chase Lincoln agreement, Chase Lincoln agreed to waive its annual fee for the first year of a member's participation in the credit card program. By the SC-ABS agreement, ABS agreed to pay any annual fees charged by Chase Lincoln during the remaining term of the SC-ABS agreement. For some members, their second year of participation in the credit card program began in August or September 1987. Chase Lincoln charged a membership fee for that year (the second year fee) and ABS was unable to obtain a waiver. ABS issued checks to members reimbursing them for the second year fees, but a substantial amount of those checks were dishonored by ABS's bank. Petitioner considered ABS in breach of the SC-ABS agreement and terminated that agreement by a letter to ABS dated December 29, 1987 (the December 29 letter). The December 29 letter requested ABS to comply with Article 9 of the SC-ABS agreement, "specifically including returning to the Club all lists of Sierra Club members".

Petitioner's Receipts

Petitioner's receipts from the credit card program were $6,021 and $303,225, for its taxable years ending September 30, 1986 and 1987, respectively.

OPINION

I. Introduction

Respondent determined deficiencies in petitioner's 1986 and 1987 Federal income taxes based, in part, on adjustments made

with respect to petitioner's participation in the credit card program described in our findings of fact. Petitioner's receipts from the credit card program (the receipts) were $6,021 and $303,225 for 1986 and 1987, respectively. Respondent adjusted petitioner's "unrelated business taxable income" by including the receipts and determining that they did not constitute "royalties" within the meaning of section 512(b)(2). Among other assignments of error, petitioner assigns error to respondent's determinations of deficiencies based on petitioner's participation in the credit card program. Principally, petitioner argues that the receipts were "royalties" within the meaning of section 512(b)(2). Alternatively, petitioner argues: (1) Its activity with respect to the credit card program did not constitute a trade or business, (2) that activity was substantially related to its exempt purposes, and (3) that activity was not regularly carried on.

The parties have raised principally questions of fact with respect to the receipts. The credit card program was the product of numerous agreements between various parties (the agreements), including petitioner, ABS, and Chase Lincoln. We shall look to the agreements, along with the relevant facts and circumstances surrounding the execution of the agreements, to determine the nature and character of the receipts. Petitioner bears the burden of proof. See Rule 142(a).

## II.  Internal Revenue Code

Pursuant to sections 511 through 513, an organization otherwise exempt from the income tax is required to pay tax, at regular corporate rates, on its "unrelated business taxable income" (UBTI).  UBTI is defined by section 512(a)(1) as "the gross income derived by any organization from any unrelated trade or business * * * regularly carried on by it * * * [less certain deductions and with certain modifications]."  As relevant here, section 512(b)(2) excludes from UBTI "all royalties * * * whether measured by production or by gross or taxable income from the property".

## III.  Definition of Royalties

In Sierra Club (1996), 86 F.3d at 1532, the Ninth Circuit held:  "[U]nder § 512(b)(2) 'royalties' are payments for the right to use intangible property."  Accord Disabled Am. Veterans v. Commissioner, 94 T.C. 60, 70 (1990), revd. on other grounds 942 F.2d 309 (6th Cir. 1991).  The Ninth Circuit further held that a royalty is by definition "passive" and, thus, "cannot include compensation for services rendered by the owner of the property."  Sierra Club (1996), 86 F.3d at 1532.

## IV. Arguments of the Parties

Both parties fasten on the definition of the term "royalties" adopted by the Ninth Circuit.  Petitioner argues that its name, logo, and mailing list are all intangible assets, which, by one of the agreements (the SC-ABS agreement), it licensed to ABS in return for payments that, in form and

substance, were "royalties", as that term is used in section 512(b)(2). At trial and on brief, respondent variously claims that petitioner was in the business of either (1) "marketing", (2) "sponsoring, promoting, and marketing", or (3) "sponsoring, endorsing, promoting, and marketing" a credit card (the credit card). Respondent argues that none of the agreements licensed or otherwise made available petitioner's name, logo, or mailing list to ABS or Chase Lincoln. Instead, respondent argues: The agreements were for services only, and "[t]he income Sierra received emanated from activities it engaged in and services it performed". Respondent argues that "in the first instance", the fee paid by Chase Lincoln pursuant to the Concept-Chase Lincoln agreement was the income of petitioner, and <u>petitioner</u> then <u>paid ABS</u> for services ABS provided to petitioner. Because we find that the receipts constitute "royalties" within the meaning of section 512(b)(2), we need not address petitioner's alternative arguments.

V. <u>Discussion</u>

    A. <u>Payment of Royalties</u>

The principal agreement governing petitioner's participation in the credit card program is the SC-ABS agreement. We have no doubt that petitioner and ABS, in entering into the SC-ABS agreement, had in mind the use by ABS of petitioner's name and marks in connection with ABS's marketing efforts under the SC-ABS agreement. Our reasoning is essentially as follows.

The description of services attached to the SC-ABS agreement (ATTACHMENT "A") recites that members who become cardholders will receive a credit card with the name of petitioner on one side and a "logo or other design of SC" on the reverse side. Also, Article 9 of the SC-ABS agreement (hereafter, Art. 9) provides that, if ABS defaults, it must immediately cease using petitioner's name and marks. In light of the provisions cited, we view ABS's agreement that it will obtain prior written consent from petitioner for use of its name or marks (Article 3.5) as a provision regulating ABS's use of those items and preserving petitioner's property interests therein. Similarly, we view petitioner's right to advise and consent with regard to the marketing materials prepared by ABS (see Article 4.3) as a right intended to safeguard petitioner's name, marks, logo, and the other intangibles (such as facsimile signatures of petitioner's officers) used in marketing the credit card program.

The SC-ABS agreement further implicitly provides that ABS will be allowed access to the members. The parties have stipulated that petitioner provided lists of the members directly or indirectly to ABS in connection with the credit card program. The preamble to the SC-ABS agreement recites that the parties thereto "desire to make available to the members of SC" the services to be offered by ABS. Article 3.3 entitles ABS to offer additional services to the members and, if ABS defaults, Art. 9 requires ABS to cease communicating with the members. Thus,

notwithstanding the lack of particular language setting forth ABS's right of access to the members, we think it clear that such access is a key component of ABS's rights under the SC-ABS agreement, to be accomplished by the use (license) of petitioner's mailing lists to ABS.

We conclude that the SC-ABS agreement made available for ABS's use petitioner's name, marks, logo, and certain other intangible property used in marketing (such as facsimile signatures of petitioner's officers), as well as provided ABS access to the members by way of petitioner's mailing lists. The financial consideration petitioner received under the SC-ABS agreement (the receipts), therefore, was, at least in part, consideration for the use of valuable intangible property, and as such constituted royalties within the meaning of section 512(b)(2). See supra sec. III.

B. Petitioner Did Not Receive Payments for Services

1. Introduction

We now turn to the question of whether any part of the receipts was received by petitioner in consideration of its services. In the context of its argument that petitioner was in the business of marketing the credit card program to the members, respondent argues that petitioner was compensated for performing the following services: (1) controlling the marketing plans, (2) offering the affinity credit card as a member service, (3) placing advertisements for the affinity credit card in its magazines and local publications, (4) allowing solicitations to

be made using its nonprofit mail permit, (5) actively endorsing and sponsoring the acquisition of the affinity credit card through brochures and letters from its officers, (6) guaranteeing refunds of the annual fee if the Chase Lincoln imposed such a charge, and (7) attempting to persuade the Chase Lincoln to relax its credit tolerances so that additional affinity credit cards could be issued and higher profits realized.

    2.  <u>Control of Marketing Plans</u>

    a.  <u>SC-ABS Agreement</u>

Respondent argues that petitioner controlled the marketing plans for the credit card program, and, thus, petitioner was compensated for providing services. Petitioner's rights and duties with respect to marketing are set forth in the SC-ABS agreement. For the most part, the SC-ABS agreement assigns to ABS responsibility for marketing the credit card program. Article 4.2 assigns to ABS the initiative for developing marketing plans: "ABS shall be responsible for the development of all promotional and solicitation materials and programs designed to encourage the acquisition and usage of the Services by the members". Article 4.2 imposes on ABS the cost of such materials and programs, unless petitioner elects (which it did not) to pay for production and mailing costs in consideration of a larger payment. Article 3.3 places with ABS the initiative to propose additional services to offer to the members.

Article 4.2 subjects promotional and solicitation materials and programs developed by ABS to approval by petitioner.

Petitioner, thus, had control over those materials and programs by way of its power to negate. As discussed _infra_ in section V.B.2.c, we believe that such control was exercised by petitioner to safeguard the valuable intangible property rights that it had licensed to ABS. In theory, at least, petitioner's power to negate could allow petitioner to assume responsibility for development of the marketing program. Practicably speaking, however, such responsibility does not appear to have been intended, since the SC-ABS agreement contains no provision to compensate ABS for following petitioner's directions except if petitioner elects to bear solicitation costs, Article 4.3, or requests certain nonroutine actions, Article 4.4.

Petitioner's other significant rights under the SC-ABS agreement do not give petitioner control directly or indirectly over any marketing plan. Article 3.2 provides that petitioner is entitled to monthly accountings from ABS from which it can determine total cardholder sales volume and its share thereof. Article 3.5 prohibits ABS from using petitioner's name or marks without its consent. Article 6 generally holds petitioner harmless from losses except as otherwise specified.

Article 6.3 provides that the agreement is not to be construed as constituting an agent-principal relationship between petitioner and ABS, which tends to eliminate one kind of control over marketing that respondent has implied.

Article 2.1 sets forth petitioner's principal duty with respect to the SC-ABS agreement: "SC agrees to cooperate with

ABS on a continuing basis in the solicitation and encouragement of SC members to utilize the services provided by ABS."[1] ATTACHMENT "B", read in conjunction with the Concept-Chase Lincoln Agreement, provides that, in consideration of its cooperation, petitioner is to receive a minimum of 0.25 percent of total cardholder sales volume. ATTACHMENT "B" further provides that petitioner is to receive royalties if members purchase certain additional services.

Finally, under the SC-ABS agreement, as implemented, petitioner did not receive a fee for any marketing activities or share in any economies realized by ABS in its expenditures made in carrying out its marketing responsibilities.

We conclude that petitioner did not control the marketing plan for the credit card program and, thus, was not compensated for providing marketing services.

b.  Petitioner's Intent

We have also considered the negotiations preceding the SC-ABS agreement and its implementation. As stated, petitioner did have some control over marketing efforts through its right to approve all promotional and marketing materials and programs. Nevertheless, the SC-ABS agreement, considered in light of the parties' negotiations and course of action preceding it, convinces us that, in entering the SC-ABS agreement, petitioner

---

[1]  Article 4.3 gives petitioner the privilege, but not the duty, to pay production and mailing costs of solicitations, for increased compensation.

intended not to be responsible for marketing efforts with regard to the credit card program, except to exercise its approval rights with respect to ABS's efforts in that regard. Indeed, Michael McCloskey, chairman of Sierra Club, testified that, at the inception of the credit card program, he anticipated that the only staff resources that petitioner would have to devote to the program would be "a bit" of the time of Leonard Levitt, then director of finance and administration, and that no additional office space would be necessary. Mr. McCloskey was credible, and his testimony supports our conclusion that, in entering into the SC-ABS agreement, petitioner did not contemplate being in the marketing business or performing marketing services for compensation.

c. Safeguarding Intangible Property Rights

We do not view petitioner's actual exercise of its rights and duties under the SC-ABS agreement as amounting to the performance of services. Petitioner acted to safeguard its intangible property interests. Article 4.2 placed the responsibility for developing marketing materials on ABS. Petitioner exercised its right of approval and, as a result, the "pitch" of ABS's marketing proposals was "toned down", and proposals for telemarketing, membership solicitation and drive packages, membership renewal packages, automatic membership renewal, and automatic monthly billing of contributions were eliminated from the marketing plan. ABS's presentation of its initial marketing plan (the initial plan) and petitioner's

responses to the initial plan were accomplished in a relatively short period.  We do not view petitioner's exercise of its discretion as a disguised attempt to exercise creative or production control over ABS's efforts.  Moreover, we do not find the existence, or exercise, of petitioner's rights to be inconsistent with a royalty arrangement.  In <u>Wm. J. Lemp Brewing Co. v. Commissioner</u>, 18 T.C. 586 (1952), we dealt with an agreement that allowed a party to manufacture and sell beer under an old family name used by the taxpayer.  The agreement reserved to the taxpayer a right of approval over methods of brewing, advertising, and the marketing of beer that would carry its name. We stated:

> The significance of such provision, when read in the light of the entire agreement, is that petitioner, having licensed the use of its formulae and trade name, desired to retain the right to supervise the methods of brewing, advertising, and marketing of beer sold under the "Lemp" name for the protection and preservation of what petitioner considered a valuable property right. Since the license granted was for an indefinite period, and could be canceled by * * * [the licensee] at will, such a protective provision was a most desirable one. * * *

<u>Id.</u> at 596.  We found that payments made pursuant to the agreement to manufacture and sell beer under the family name were royalties.  <u>Id.</u> at 597; see also <u>Disabled Am. Veterans v. Commissioner</u>, 94 T.C. at 78.

Here, when viewed in light of the SC-ABS agreement and the negotiations that preceded it, we conclude that petitioner's exercise of its right of approval with respect to ABS's marketing proposals evidences only petitioner's concern with

protecting the worth of its property interest in its good name and marks. It was not an indirect method of putting petitioner in the business of marketing, nor was it a marketing service provided by petitioner to ABS pursuant to the SC-ABS agreement.

### d. Conclusion

For the reasons stated, we conclude that petitioner did not control the affinity credit card program's marketing plans except to the extent that it reserved the right to approve any use of its name, marks, and logo. Such reserved right is commonplace in licensing agreements, and the mere retention of quality control rights by a licensor in a licensing agreement situation does not cause payments to the licensor under the agreements to lose their characterization as royalties. Sierra Club (1996), 86 F.3d at 1533 n.15 (quoting Rev. Rul. 81-178, 1981-2 C.B. 135); see id. at 1535-1536 (petitioner did not perform services with respect to the rental of mailing lists even though it retained the right to approve the contents of mailings of list users).

### 3. Member Services

Respondent argues that petitioner offered the credit card as a member service. While it is true that petitioner endorsed the credit card program, Chase Lincoln was the financial institution that extended credit to the members, and it was ABS's marketing efforts that brought the possibility of the credit card and certain other services to the attention of the members. Although the term "member service" appears in certain

solicitations for the credit card program, petitioner expressly did not treat the credit card to be a member service in the sense of a service being offered and overseen by petitioner. Rose Marie Maune (Ms. Maune) was employed by petitioner from 1976 until 1992. She was petitioner's membership director until about the years in issue, when she became director of operations, where she fulfilled a similar role. Ms. Maune testified that the membership services department did not handle any inquiries regarding the affinity credit card program. She testified that they would not answer members' questions because they were not in control of the program. Moreover, petitioner did not provide any significant administrative services with respect to the credit or other services provided by Chase Lincoln and ABS.

If, by characterizing the credit card program as "a member service", respondent means that petitioner provided something of value to the members, that something was the opportunity for the members to benefit petitioner by using a credit card that was to be provided by Chase Lincoln or to use a travel service that was affiliated with ABS. That is the essence of an affinity card program, and the intended result of the license of the organization's name, logo, mailing list, and other intangibles. The income received in consideration for such licenses alone is royalties within the meaning of section 512(b)(2).

4. <u>Advertising</u>

ABS advertised the credit card program in both petitioner's national magazine, Sierra, and in the publications of local chapters. ABS was charged the usual rates for such advertisements, although it failed to pay amounts billed to it for advertisements in Sierra for 1987 in the amount of $8,230. Petitioner attempted to collect that amount but was unsuccessful.

The SC-ABS agreement does not require petitioner to accept advertisements from ABS although it does require petitioner "to cooperate with ABS on a continuing basis in the solicitation and encouragement of SC members to utilize the Services provided by ABS". It is conceivable that petitioner and ABS contemplated such cooperation as extending to the acceptance of advertising by petitioner. Even if that were so, however, the evidence is that ABS was charged the usual rates for advertising. Although ABS failed to pay for its 1987 advertisements, nothing indicates that, when petitioner accepted ABS's advertising, petitioner had any lower expectation that ABS would pay than it had for any other advertisers. In other words, there is no evidence that petitioner extended ABS any credit preference. That being the case, we find no basis for concluding that any portion of the receipts was in consideration of advertising services. Neither do we conclude that petitioner anticipated ABS's failure to pay its 1987 bill and, in negotiating the SC-ABS agreement,

bargained for, and received, any consideration on account of that anticipation.

Generally, income realized by an exempt organization from the sale of advertising in a periodical is taxable UBTI. See sec. 1.512(a)-1(f)(2), Income Tax Regs. The SC-ABS agreement was not a contract for advertising, and, notwithstanding that petitioner entered into contracts for advertising at the same time it was obligated under the SC-ABS agreement, nothing in sections 511 through 513 or the opinion of the Ninth Circuit in Sierra Club (1996) indicates to us that the contemporaneous existence of obligations under the two contracts necessarily means that some or all of the receipts, received pursuant to the SC-ABS agreement, cannot properly be characterized as "royalties" under section 512(b)(2).

None of the receipts were received on account of petitioner's providing advertising to ABS.

### 5. Nonprofit Mail Permit

In soliciting the members with respect to the credit card program, ABS, on at least one occasion, used petitioner's nonprofit mail permit. ABS paid the postage.

During the years 1986 through 1992, petitioner held a nonprofit mail permit (the mail permit) and regularly used the mail permit to send communications to its members, supporters, and other interested persons at the nonprofit rate. Under U.S. Postal Regulations, cooperative mailings may be made at the special bulk rates available to nonprofit organizations

only when each of the cooperating organizations is individually authorized to mail at the special bulk rates.

Edward Shelton, president of ABS, testified that it was a business mistake for ABS to use the mail permit because of mail delivery restrictions applicable to such permitted mail. He also testified that ABS paid the postage and that use of the permit was not considered when the SC-ABS agreement was entered into and petitioner became obligated "to cooperate". Mr. Shelton was credible in all of that testimony.

We have found that petitioner was not in the business of marketing the credit card program or in the business of providing marketing services to ABS. The mailings in question were ABS', and, thus, since ABS was not entitled to the special bulk rates in question, ABS' use of the mail permit was unlawful. Because it involved an unlawful action, we hesitate to classify it as cooperation under the SC-ABS agreement. We become firm in that conclusion based on Mr. Shelton's credible testimony that, at the time that agreement was entered into, it was not considered. Therefore, we conclude, and find, that use of the mail permit was not a service provided to ABS pursuant to the SC-ABS agreement.

None of the receipts were received on account of ABS's use of the mail permit.

### 6. Active Endorsement and Sponsorship

Respondent argues that the obligation "to cooperate" imposed on petitioner by Article 2.1 is an obligation to

perform services, particularly including the service of endorsing and promoting the credit card program.

As has been well established, in many respects, the SC-ABS agreement is ambiguous. Nevertheless, considering both the SC-ABS agreement and the circumstances preceding and following its execution, we conclude that petitioner's obligation to cooperate was not an agreement to endorse or promote the credit card program beyond the endorsement that necessarily results from petitioner's license of its logo, name, and the other intangibles here in question.

The use of petitioner's name, marks, logo, and its continued endorsement was precisely the valuable consideration petitioner provided pursuant to the SC-ABS agreement, and it was precisely for what ABS was paying. Petitioner may have approved solicitations and communications to the members with respect to the credit card program, but it was ABS that designed and paid for those communications, which actions were, primarily, for its own benefit, pursuant to its duties under the SC-ABS agreement. Respondent has stated in a revenue ruling that income from the endorsement of products, use of signatures and trademarks, and review of licensed products is a royalty within the meaning of section 512(b)(2). Rev. Rul. 81-178, 1981-2 C.B. 135 (distinguishing circumstance where personal services, in the form of appearances and interviews, are required). Accord <u>Mississippi State Univ. Alumni, Inc. v. Commissioner</u>, T.C. Memo. 1997-397.

Petitioner's endorsement and promotion of the credit card program were not in consideration of the receipt of anything other than "royalties" within the meaning of section 512(b)(2).

### 7. Refunded Annual Fee

Respondent argues that petitioner guaranteed the members a refund of Chase Lincoln's second year membership fee (the second year fee), if, indeed, Chase Lincoln imposed a second year fee. Respondent notes that petitioner actually reimbursed some of the members for ABS's dishonored checks and argues that petitioner therefore provided a service pursuant to the credit card program.

No plausible reading of the agreements reveals any obligation by petitioner to use its own funds to reimburse the members for the second year fee. We have found that, pursuant to the SC-ABS agreement, petitioner allowed ABS to use petitioner's name and marks in connection with ABS's marketing efforts under the SC-ABS agreement. Supra sec. V.A. Implicit in its license of its name and marks, and allowing ABS to use facsimile signatures of its officers, is petitioner's endorsement of whatever ABS is marketing. See Rev. Rul. 81-178, 1981-2 C.B. at 136 ("payments for the use of a professional athlete's name, photograph, likeness, or facsimile signature are ordinarily characterized as royalties."). Although a licensor may not expect the value of its name or other intangibles to suffer on account of their license, we assume that some portion of the royalty is in consideration of

the licensee assuming that risk.  The Commissioner's position in Rev. Rul. 81-178, id., with which we agree, Disabled Am. Veterans v. Commissioner, 94 T.C. at 70 (1990), revd. on other grounds, 942 F.2d 309 (6th Cir. 1991), is that payments for the use of a name or signature, without any personal appearance or interviews, are royalties within the meaning of section 512(b)(2).  In part, petitioner received royalty income in consideration of assuming the risk of damage to its intangible assets.  When that risk matured into a foreseeable loss, petitioner spent its own money to avoid that loss.  That is not inconsistent with its receipt of royalty income.

### 8. Extension of Credit

Pursuant to the Concept-Chase Lincoln agreement, Chase Lincoln was responsible for receiving and processing applications for the affinity credit card at its sole expense. Chase Lincoln retained a subcontractor to run the credit scoring system.  Chase Lincoln was responsible for issuing the credit cards to all of the members that qualified, also at Chase Lincoln's sole expense.  Under the agreements, other than Chase Lincoln's right to acquire responsibility for the duties of ABS and Concept, the duties of the parties were discrete: e.g., no party other than Chase Lincoln could accept an application for credit (i.e., issue a credit card).  Respondent argues that petitioner attempted to persuade Chase Lincoln to relax its credit tolerances so that additional credit cards could be issued and higher profits realized.  Respondent

asserts that this was a service for which petitioner received compensation under the credit card program. We believe that that argument is more properly addressed to respondent's conceded joint venture theory, and we fail to see how it advances respondent's payment-for-services argument. We, therefore, find that petitioner was not compensated for services to the extent that it attempted to persuade Chase Lincoln to relax its credit tolerances so that additional credit cards could be issued and higher profits realized.

### 9. Conclusion

For the foregoing reasons, we conclude that none of the receipts were in consideration for services provided by petitioner as part of the credit card program. Rather, the receipts were in consideration for the use of petitioner's valuable intangible property, and, as such, constituted "royalties" within the meaning of section 512(b)(2).

### C. Subsequent Events

After the years here in question, ABS defaulted in its obligations, petitioner terminated the SC-ABS agreement, and entered into two agreements, the Termination Agreement and the Bankcard Agreement (the two agreements), with Chase Lincoln. The two agreements, among other things, establish a direct relationship between petitioner and Chase Lincoln, provide for the issuance of a new credit card not bearing petitioner's logo, and provide that petitioner would bear certain advertising expenses. Whether amounts received in

consideration of petitioner's duties and obligations under the two agreements would pass muster as "royalties" is not a question now before us. We believe, however, that the reordering of relationships under the two agreements constitutes a sufficiently significant change that those relationships are not determinative of results under the credit card program.

## VI. Conclusion

Amounts received by petitioner pursuant to the SC-ABS agreement during the years in question (the receipts) constituted "royalties", within the meaning of section 512(b)(2) and were not compensation for services. Therefore, we need not consider petitioner's alternative arguments that the receipts do not constitute UBTI.

Decision will be entered

for petitioner.